## UNITED STATES ex rel. SCHLUETER v. WATKINS, as District Director of Immigration and Naturalization.

District Court, S. D. New York.
Aug. 6, 1946.

Habeas corpus proceeding by the United States of America, on the relation of Herman Schlueter, against W. Frank Watkins, as District Director of Immigration and Naturalization of the United States for the District of New York, or such person, if any, as may have the relator in custody.

558

to obtain relator's release from custody under an order for his removal from the United States.

See also 67 F.Supp. 554.

David S. Kumble and George C. Dix, both of New York City, for relator.

John F. X. McGohey, U. S. Atty., of New York City (Stanley H. Lowell, Asst. U. S. Atty., of New York City, of counsel), for respondent.

RIFKIND, District Judge.

The petition for a writ of habeas corpus, filed on behalf of the relator by his attorney, alleged: The relator was in custody of the District Director of Immigration and Naturalization for the District of New York. No cause for his detention or restraint had been assigned to the relator other than that he was a native or citizen of Germany and, therefore, subject to detention under the provisions of Title 50 of the U.S.C.A., and that the Attorney General had directed his apprehension and removal from the United States. The detention, restraint and order of removal were illegal by reason of the following:

"4. Relator was born in Germany on January 27, 1915 and emigrated to the United States, arriving on March 13, 1929, to join his father, mother and sister, who were already here. Since his arrival relator has been steadily employed as a clerk in a delicatessen store on Long Island and as a bar tender and lunch counter man. Being a German citizen relator declined to serve in the United States Army against Germany but after the German surrender expressed his willingness to serve in the United States armed forces against Japan. He was interned at the outbreak of the war and volunteered for forest work in the forests of the United States and later was paroled to work in essential industry until September 1945, whe (sic) he was again arrested and interned. During relator's detention at Ellis Island he was given a Repatriation Hearing and in April 1946 was served with an order of the Attorney General directing him to depart from the United States within thirty days and in the event relator failed or neglected to depart from the United States within said thirty days the Commissioner of Immigration and Naturalization was to provide for relator's removal to Germany. On Wednesday, May 1, 1946, relator was arrested and taken to Ellis Island, where he is now held.

"5. In August 1945 relator was served with a notice reading in part as follows:

" 'By proclamation of July 14, 1945 the President of the United States, acting under the authority of the Alien Enemy Act of 1798 (50 U.S.C. 21–24), has prescribed the following regulations, additional and supplemental to those prescribed by earlier proclamations:

" 'All alien enemies now or hereafter interned within the continental limits of the United States pursuant to the aforesaid proclamations of the President of the United States who shall be deemed by the Attorney General to be dangerous to the public peace and safety of the United States because they have adhered to the aforesaid enemy governments or to the principles of government thereof shall be subject upon the order of the Attorney General to removal from the United States and may be required to depart therefrom in accordance with such regulations as he may prescribe.'

" 'Pursuant to the above proclamation and based upon the evidence considered at your earlier alien enemy hearing or hearings, it has been determined that you should be removed and repatriated to the country of your nationality as soon as arrangements for your transportation can be made.'

"6. Relator was given hearings before Hearing Boards at different times and places and at each of said hearings was advised by the representatives of the Attorney General that he had no right to be represented by counsel, was not informed of the charges against him, was not confronted with witnesses and was not allowed to examine or cross-examine any witnesses. Said hearing boards based their judgment on hearsay or incompetent evidence. The Attorney General alone knew the charges, the Attorney General heard the testimony and the Attorney General decided upon

relator's internment and removal from the United States.

"7. After the alleged Repatriation Hearing the relator was informed in writing that the Attorney General deemed relator to be dangerous to the public peace and safety of the United States because he has adhered to a government with which the United States is at war or to the principles thereof and had ordered relator to depart from the United States within thirty days after notification of said order and had ordered further that in the event relator failed or neglected to depart from the United States within said thirty days the Commissioner of Immigration and Naturalization was to provide for relator's removal to Germany.

"8. Said order is illegal, arbitrary and capricious. It is not based upon any fair or known standard by which relator's liability to removal can be established, nor is said order or removal authorized by law. No fair hearing was ever accorded to relator nor was any complaint ever served upon him charging him with actual hostility or other crime against the public safety, nor was any proceeding instituted against him in any court of the United States to determine the propriety of his internment, deportation or removal. Nor was any opportunity afforded him to defend himself in any court of the United States against charges that his remaining at large in this country now would be dangerous to the public peace or safety of the United States.

"9. Relator, since his arrival in the United States, has been a law abiding resident."

The petition further alleged that to remove the relator to Germany at this time would constitute the infliction of cruel and unusual punishment, prohibited by the Constitution.

Finally, the petition alleged the following grounds upon which the relator should be discharged:

"1st. That the relator's detention was illegal in that he was not afforded a hearing before a United States Court as required by the provisions of Title 50 of the United States Code, he then being an enemy, resident and at large, within the jurisdiction of a United States court.

"2nd. That relator's detention is illegal for the reason that he at the present time is not a native, citizen, denizen, or subject of a hostile nation or government.

"3rd. That the proceedings heretofore had by the Attorney General of the United States have deprived him of his rights and liberty without due process of law and of the right to be represented by counsel in such proceedings and that such deprivation of his rights and threatened removal is contrary to the provisions of the Constitution and law of the United States.

"4th. That the alleged hearings were unfair and a pretense because the Attorney General had prejudged the matter and prior to said Repatriation Hearing had already determined that relator be removed from the United States and returned to the country of his nationality.

"5th. That the contemplated removal of relator is contrary to the dictates of humanity and contrary to natural and international law, and under present conditions in Germany would inflict cruel and unusual punishment on relator."

The respondent's return alleged:

"1. The relator * * * is being held in custody as an alien enemy pursuant to the provisions of Title 50, Section 21, United States Code, and the Proclamation of the President, No. 2526, dated December 8, 1941.

"2. The relator is a native, citizen, denizen or subject of Germany.

"3. The relator was born in Bremen, Germany, on January 27, 1915.

"4. The relator has been ordered removed from the United States by an order of the Attorney General, dated March 28, 1946, pursuant to Proclamation of the President, No. 2655, dated July 14, 1945."

The return denied, on information and belief, each and every allegation contained in paragraph numbered 6 of the petition, except that it admitted that the relator had hearings before several Hearing Boards; and denied, on information and belief, each and every allegation contained in paragraph numbered 8 of the petition, except that it

admitted that the relator was not tried by a court of the United States.

The mentioned order of removal reads as follows:

"Whereas, Hermann Fred Schlueter is a German alien enemy over the age of fourteen years who has theretofore been interned by order of the Attorney General dated November 27, 1942; and (internment—II May 2, 1944),

"Whereas, the said alien enemy was, at his request, accorded a full hearing before a Repatriation Hearing Board on the issue of his removal from the United States; and

"Whereas, upon consideration of the evidence presented before the Alien Enemy Hearing Board on October 15, 1942, and before the Repatriation Hearing Board on August 4, 1945, I deem said alien enemy to be dangerous to the public peace and safety of the United States because he has adhered to a government with which the United States is at war or to the principles thereof: Now, therefore,

"It is ordered that the said alien enemy depart from the United States within thirty days after notification of this order; and

"It is further ordered that, in the event the said alien enemy fails or neglects to depart from the United States within the said thirty days, the Commissioner of Immigration and Naturalization is directed to provide for the alien's removal to Germany.

/s/ Tom C. Clark
"Attorney General

"Dated, Washington, D. C.

"Mar 28 1946"

Upon the trial relator was represented by counsel of his own selection. At the opening of the trial, relator sought and obtained leave of court orally to traverse several allegations of the return including the affirmative allegations hereinabove recited. By this traverse no new issues were made. Colloquy with relator's attorney made it quite clear that he was challenging the legal conclusion but not the facts recited in the allegations.[1]

Relator's counsel asked for production of the Attorney General's file concerning relator. Judge Bright, on a motion made before trial, had ordered the production of the record of whatever hearing relator may have had. The United States Attorney refused to produce the record and instead submitted a letter from the Acting Attorney General which is set forth in the margin.[2]

---

[1] "The Court: Relator rests. Now, before you do rest, let me ask you one or two questions. You stated in your traverse that you denied Allegation No. 1 of the return. Isn't that correct?

"Mr. Kumble: Yes sir.

"The Court: Now do you mean by the denial to deny the allegation of fact therein contained or the legal implication?

"Mr. Kumble: The legal implication.

"The Court: You do not deny that Herman Schluetter is being held in custody and that the authority claimed for his detention is the provisions of Title 50, Section 21 and the Proclamation of the President?

"Mr. Kumble: No, I do not.

"The Court: Very well. Now you deny or traverse the allegations of Paragraph 4. There, I take it, likewise you do not contradict—

"Mr. Kumble: The fact that an order was served.

"The Court: —the order which ordered or which purported to order him removed.

"Mr. Kumble: Yes.

"The Court: You are denying the legal implication?

"Mr. Kumble: Yes sir."

[2] Office of the Attorney General
Washington, D. C.
May 29, 1946

John F. X. McGohey, Esq.
United States Attorney
United States Courthouse
Foley Square
New York 7, New York.
Attention: Stanley Lowell, Assistant U. S. Attorney

Dear Mr. McGohey:

I refer to your telephone conversation of May 29 in which you advised my office that by order of even date Judge Bright of the District Court of the United States for the Southern District of New York had ordered the production of records and papers of this Department in a habeas corpus proceeding involving an alien enemy ordered removed pursuant to the Alien Enemy Act of 1798.

Your attention is called to the provisions of Attorney General's Order #3229, dated May 2, 1939, which forbid disclosure of confidential documents of the Department in the absence of my authorization. All the files and documents relating to alien enemy proceedings, including those both of the Alien Enemy Con-

Assuming the requested material to be importantly relevant, the government, in a criminal proceeding, would be deemed to have abandoned its privilege, United States v. Beekman, 2 Cir., April 26, 1946, 155 F.2d 580, at page 584; United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503; United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 156 A.L.R. 337; and I see no very persuasive reason why it should not apply in habeas corpus. True, the United States is not the plaintiff in such a proceeding and hence cannot be said to waive the privilege by virtue of its instituting the action; but the United States did take the action, i. e., detained the petitioner, which is the subject of review. Moreover, the theory of waiver upon which the requirement of disclosure has been based seems to me to be the kind of useful fiction which the law invents to express an underlying public policy. That public policy is that a person should not be deprived of his liberty without giving him an opportunity to have access to material which might exculpate him. The considerations underlying such public policy are present in this case in abundance since it involves deportation.[3] Since the records were not produced the court could not, as the circuit court has directed, read them to determine their relevance. Relator's counsel, however, stated that he knew their contents and knew what they would show. He was, therefore, permitted to state what in his opinion the records would show and the court announced that it would accept the statement as proof. Thus the respondent could, by production of the records, refute the statement, and the relator was in no way prejudiced by the non-production. Respondent acquiesced in this procedure.

The statement of the relator's attorney was as follows:

"Mr. Kumble: Well I can tell your Honor that generally the file will disclose that this man was accorded a so-called hearing before a hearing board at Ellis Island, at which he was instructed that he had no right to be represented by counsel and could not be represented by counsel; at which he was not told the nature of any charge against him; was not given the opportunity to defend himself against any charge; at which he was not permitted to be present during the examination of witnesses and at which he was not given the right to examine or cross-examine witnesses, and at which he was even excluded from the room at the time his own witnesses were called.

"I submit that the basis on which this order of deportation was made—

"The Court: Just tell me what the file would show.

"Mr. Kumble: That the basis on which the order of deportation was made was made on hearsay and on no evidence whatever of any competent nature to show that the man was in any way dangerous to the security or safety of this country."

The relator testified in his own behalf that he was born on January 27, 1915, in Bremen, Germany; that he came to the United States in 1929 and that he has lived in the United States ever since. In 1933 he became a member of the Friends of New Germany, later known as the German American Bund. He is not, and never was, a

---

trol Unit and of the Immigration and Naturalization service, fall within this category.

I understand that, in the instant case, relator's status as an alien enemy is conceded. In view of the clear line of authority holding that, in habeas corpus proceedings brought to test the propriety of action taken under the Alien Enemy Act of 1798 in time of war, the only subject into which the courts may properly enquire is whether in fact relator is an alien enemy, I do not feel warranted in authorizing the disclosure here in question.

You are authorized to show this letter to the court and to request that the order to produce records of this Department be vacated in so far as it affects those in the confidential category.

Please advise me at the earliest possible moment of any developments which may occur.

Sincerely,

J. Howard McGrath
Acting Attorney General

[3] In Bowles v. Ackerman, D.C.S.D.N.Y.1945, 4 F.R.D. 260, 262, Judge Bright applied United States v. Andolschek, supra, to a civil suit.

citizen of the United States. On July 31, 1942, he was arrested and interned. From May 1, 1944 to November 15, 1944, he worked for the United States Forest Service, and from February 1945 to July 28, 1945, he was employed on war work by a private employer. On July 28, 1945, he was returned to Ellis Island where he had been interned. He had registered for selective service and was classified 4–C. He remained in that classification until the Fall of 1941 when he was reclassified 1–A. He claimed his privilege not to serve in the U. S. Armed Forces. Thereafter he was given a hearing at which he was asked whether he would be willing to serve in the U. S. Armed Service if he were made a citizen of the United States and he answered in the affirmative. On August 4, 1945 he had a further hearing before a hearing board composed of Mr. Ennis, Mr. Rhetts and Mr. Burling. At this hearing he was advised that he could not be represented by an attorney but that his lawyer could attend as a friend without participating in the hearing. Before the hearing he had received an order as alleged in paragraph 5 of the petition and, in response to the question which was annexed to the order, he had requested the hearing. He was asked at the hearnig whether he had anything to say why he should not be removed from the United States. He was not permitted to be present while witnesses were called and examined, whether his own witnesses or otherwise, nor to examine or cross-examine any witness. He was told and he knew that he was charged with being an enemy alien dangerous to the public peace and safety of the United States because, it was claimed, he had adhered to the German Government and to its principles of government.

No other witnesses testified on behalf of the relator, and no testimony whatever was offered on behalf of respondent.

These preliminaries are narrated with a degree of detail which may appear excessive. It is done in response to the recognition that liberties of the maximum value are involved in this proceeding. Removal, like deportation, may result in the loss "of all that makes life worth living." Ng Fung Ho v. White, 1922, 259 U.S. 276, 234, 42 S.Ct. 492, 66 L.Ed. 938. This possibility approaches probability when the removal is to Germany, a country ravaged by war and occupied by four conquering armies.

The claimed basis of the order of detention and removal is § 21 of Title 50 U.S.C.A. and the Proclamation of the President No. 2526, dated December 8, 1941, 6 Fed.Reg. 6323, the Proclamation of the President No. 2655, dated July 14, 1945, 10 Fed.Reg. 8947, and Regulations of the Attorney General, approved September 26, 1945, 10 Fed.Reg. 12189 (Secs. 30.72, 30.75).

The case presents for decision four questions:

1. Do the relevant congressional enactments and the proclamations and regulations issued thereunder authorize the Attorney General to remove the relator from the United States?

2. If so, are these statutes consonant with the Constitution?

3. If so, is the order upon which relator is detained nevertheless insufficient to justify the detention and the subsequent removal because it was the end product of a proceeding from which the indicia of "due process" were absent?

4. To what extent may the courts review the action of the executive in ordering the removal of an enemy alien?

These questions will be treated in the order stated.

1. Section 21 provides that:

"Whenever there is a declared war between the United States and any foreign nation or government, * * * all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized, in any such event, * * * to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those

who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; * * *."

■ The relator first argued that this section must be read together with § 23, which authorizes and imposes a duty upon the courts of the United States, after a full examination and hearing upon a complaint, when sufficient cause appears therefor, to order an alien enemy to be removed. It was his contention that only the courts, in the manner prescribed, may order removal. After the trial, by supplemental brief, the relator withdrew from this position; as indeed he was compelled to withdraw. Section 24 explicitly recognizes that presidential removal and judicial removal are alternative tools, and that either order must be observed and executed. So the cases have uniformly construed this statute. Ex parte Graber, D.C.N.D.Ala.1918, 247 F. 882, 884, 885; Minotto v. Bradley, D.C.N.D.Ill.1918, 252 F. 600, 604.

■ Relator has not, however, abandoned his claim that the statute does not authorize the order in question. He has merely shifted his ground of attack. He now concedes that an order of removal may be issued by the President pursuant to § 21, or by the court pursuant to § 23. But the view is advanced that the President may order removal only where there has been a determination that permission be withdrawn from an alien enemy to reside within the United States and that such a determination can be made only by the court under § 24. I do not agree. Relator mis-reads the language of § 21. To read the words "to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom" as requiring judicial adjudication that the alien enemy is not permitted to reside in the United States defies the simple sense of the whole section. The statute authorizes the President to direct in what cases the residence of alien enemies shall be permitted. This authority clearly and necessarily involves authority to direct in what cases the residence of alien enemies shall not be permitted. The clause immediately following authorizes him to provide for the removal of those

who belong to the latter category. There is thus no escape from the conclusion that the statute does not command a judicial determination as a necessary prerequisite to an order of removal.

2. The challenge to the constitutionality of the statute was considered by the Court of Appeals of the District of Columbia as of such little substance as not to warrant the designation of a three-judge court. Citizens Protective League v. Clark, App. D.C.1946, 155 F.2d 290, 294, 295.

The court said, 155 F.2d at pages 293, 294:

"The Alien Enemy Act is constitutional, both as an exercise of power conferred upon the Federal Government and as a grant of power by the Congress to the President. * * *

"The courts, in an unbroken line of cases from Fries' Case [C.C.D.Pa., 9 Fed.Cas. at pages 826, 830 et seq., No. 5,126] in 1799 to Schwarzkopf's case [United States v. Uhl, 2 Cir., 137 F.2d 898] in 1943, have asserted or assumed the validity of the Act and based numerous decisions upon the assumption. [Citing cases.] The judicial view has been without dissent."

The relator agrees that authority supports the respondent's position. He asserts that the time has come to overrule this long chapter of judicial history.

The summons to such an iconoclastic mission is not one to which a nisi prius judge should lend a ready ear. The argument must needs be very persuasive to convict of constitutional error some of the framers of the Constitution and their contemporaries. And it would be strange indeed that error so plain escaped detection in the course of a century and a half of constitutional history. Here the argument is not at all persuasive.

Historically, relator is in error when he reports vehement disapproval on part of the anti-Federalists of the enactment of the Alien Enemy Act, Act of July 6, 1798, 1 Stat. 577, ancestor of the statute now under consideration. He accomplishes this historical confusion by enrolling it as a member of that ill-famed company known as the Alien and Sedition Acts, Act of June 25, 1798, 1 Stat. 570 and Act of July 14,

1798, 1 Stat. 596. But those who engaged in the political and polemical battle against the Alien and Sedition Acts, and concurrently drew political dividends from this Federalist mistake, were not quite so indiscriminate. Albert Gallatin, one of the champions of the opposition, carefully distinguished among the bills directed against aliens and those directed against alien enemies. He said (2 Annals of Congress, 5th Congress, 2nd Session, 1798, p. 1980):

" * * * although Congress has not the power to remove alien friends, it cannot be inferred, as had been objected, that it had not the power to remove alien enemies; this last authority resulted from the power to make all laws necessary to carry into effect one of the specific powers given by the Constitution. Among these powers is that of declaring war, which includes that of making prisoners of war, and of making regulations with respect to alien enemies, who are liable to be treated as prisoners of war. By virtue of that power, and in order to carry it into effect, Congress could dispose of the persons and property of alien enemies as it thinks fit, provided it be according to the laws of nations and to treaties."

James Madison, in his report on the Virginia Resolutions, took pains to clear away the confusion which popular discussion had already engendered. He said:

" * * * much confusion and fallacy have been thrown into the question, by blending the two cases of *aliens, members of a hostile nation; and aliens, members of friendly nations.* These two cases are so obviously and so essentially distinct, that it occasions no little surprise that the distinction should have been disregarded; and the surprise is so much the greater, as it appears that the two cases are actually distinguished by two separate acts of Congress, passed at the same session, and comprised in the same publication; the one providing for the case of 'alien enemies;' the other 'concerning aliens' indiscriminately and consequently extending to aliens of every nation in peace and amity with the United States. With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and of course to treat it and all its members as enemies." Madison's Report, 4 Elliot's Deb., 546, 554 (1800).

The Kentucky Resolutions of 1798, 4 Elliot's Deb. 540, 541, were likewise not guilty of such lack of discrimination. They identified the offensive legislation in language which did not embrace the Alien Enemy Act.

■■ Again relator's argument suffers from an unwarranted emphasis upon the word "alien" and complete neglect of the word "enemy". Rightly conceived the latter is the important word in the Alien Enemy statute. The correct emphasis derives necessarily from the opening clause of the Act, "Whenever there is a declared war." The statute must be read in a context of war and as an exercise of the war power. The paucity of limitations upon that power is illuminated by the phrase of Charles Evans Hughes that the war power of the national government is "the power to wage war successfully." War Powers Under the Constitution, 1917, 42 A.B.A. Rep. 232, 238; Hirabayashi v. United States, 1943, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774. And, see: Rawle, A View of the Constitution, 2d Ed. 1829, p. 87; 1 Kent, Commentaries, 12th Ed. 1873, pp. 56-59; 3 Story, Commentaries on the Constitution, 1833, § 1178; Brown v. United States, 1814, 8 Cranch. 110, 122, 123, 126, 12 U.S. 110, 122, 123, 126, 3 L.Ed. 504, per Marshall, C. J.; United States v. Chemical Foundation, 1926, 272 U.S. 1, 11, 47 S.Ct. 1, 71 L.Ed. 131.

■ That the United States, despite cessation of hostilities, is still at war with Germany has been authoritatively settled. Citizens Protective League v. Clark, supra, 155 F.2d at page 295; Kahn v. Anderson, 1921, 255 U.S. 1, 9, 41 S.Ct. 224, 65 L.Ed. 469; Matter of Yamashita, 1946, 66 S.Ct. 340, 90 L.Ed. ——.

Manifestly, relator's reliance on Bridges v. Wixon, 1945, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, is utterly misplaced. That case is concerned with an alien; the instant case deals with an enemy.

■ True, the Supreme Court has never directly passed on the constitutional validity of the Alien Enemy Act. But in the light of the long history of the statute, the broad base of constitutional power from which it springs, the uniform recognition which has been accorded the statute as valid whenever occasion has arisen, and the decisions of DeLacey v. United States, 9 Cir., 1918, 249 F. 625, 626-628, L.R.A.1918E, 1011, and Citizens Protective League v. Clark, supra, the question, for this court, is settled in favor of constitutionality.

■ 3. No argument is necessary to support the relator's contention that the steps leading to the order of removal would not support a conviction for crime. He has not had due process as that term is understood in a criminal proceeding. The respondent's unequivocal answer is that relator, as an alien enemy, is not entitled thereto. The authorities support the respondent's view.

■ The proposition has been asserted that a government at war is subject to few restrictions in dealing with alien enemies. The sovereign state may take against alien enemies whatever steps it deems necessary for national security. 2 Hyde, International Law, 1922, 226.

The American courts, obedient to precedents running back to the early days of English law, have steadfastly maintained that the alien enemy has no rights other than those which the sovereign chooses to grant. "Such was the common law. * * * There is nothing in the Constitution or laws of the United States which in any way has changed the common-law rule, or restricted the power of Congress to enact the alien enemy law." DeLacey v. United States, 9 Cir., 1918, 249 F. 625, 626, L.R.A. 1918E, 1011.

■ The control of alien enemies has been held to be a political matter in which the executive and the legislature may exercise an unhampered discretion. Lockington v. Smith, C.C.D. Pa. 1817, 15 Fed.Cas. pages 758, 761, No. 8,448. To put it briefly, since the alien enemy is not, under the Constitution and the statute, entitled to any hearing—and so it has been held in this district—he cannot be heard to complain of the character of the hearing he did receive. Ex parte Gilroy, D.C.S.D.N.Y. 1919, 257 F. 110, 112, 114. And, see: Minotto v. Bradley, D.C.N.D. Ill. 1918, 252 F. 600, 604.

■ 4. The foregoing premises lead to the conclusion that the courts are without power to review the action of the executive in ordering removal of an alien enemy in time of war except with respect to the question whether the relator is an enemy alien. That has been held in a detention case in this circuit in United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 1943, 137 F.2d 898, 900. There the court put it thus:

"With the attorney general's finding that restraint of the appellant is required as a measure of public safety the courts have no concern. [Cases cited.] As these cases show, the relator's writ of habeas corpus can raise only the question whether he is an alien enemy * * *."

The judicial reasoning which has shaped this restraint upon the courts is that summary powers have been conferred upon the President by Congress through a legitimate exercise of the Congressional war power, inasmuch as the control of alien enemies is a matter exclusively within the domain of the political branch of the government.

It should be noted that despite the holding of the World War I cases that no hearing was required, the President, during World War II, did provide for hearings for arrested alien enemies. In January, 1942, the Attorney General established alien hearing boards, 10 U. S. Law Week, 1942, page 2456. These boards, composed of from three to six civilian members, served without compensation, heard the alien's evidence and made recommendations which were not binding on the Attorney General. The "hearing has been provided, not as a matter of right, but in order to permit them to present facts in their behalf," according to the instructions issued to the hearing boards, Department of Justice, Supplemental Instructions to Alien Enemy Hearing Boards, January 7, 8, 1942. The relator was afforded several such hearings.

The grant of such unusual power by the Congress to the Executive is of course closely related to the very awesome re-

sponsibility which rests upon the Executive in time of war. So long as he discharges that responsibility within the grant of authority constitutionally delegated to him, the courts have no warrant to question the wisdom of his action.

It follows that the relator has not made out a case of unlawful restraint; the writ must, therefore, be dismissed and the relator remanded to the custody of respondent.