## UNITED STATES ex rel. GREGOIRE v. WATKINS, District Director of Immigration and Naturalization.

District Court, S. D. New York.

Sept. 13, 1946.

Gunther Jacobson, of New York City, for relator.

John F. X. McGohey, U. S. Atty., of New York City (Laurence H. Axman, Asst. U. S. Atty., of New York City, of counsel), for respondent.

KNOX, District Judge.

In this proceeding Armand Gregoire, who is now detained by respondent as an alien enemy under the provisions of Title 50 U.S.C.A. § 21, and the Proclamation of the President No. 2526, dated December 8, 1941, seeks to be released from custody.

Relator was born at Metz, in the province of Lorraine, on October 9, 1894, at which time that territory was a part of Germany. His father was born there in 1865 which, of course, was prior to the disaster that overtook France in the Franco-Prussian war. He therefore, if alive and in the United States, could not possibly be regarded as an alien enemy. The son, nevertheless, by reason of the status of Lorraine at the date of his birth and notwithstanding that he is now a citizen of France, has been declared to be an alien enemy, and has been ordered to depart this country, or be removed to Germany. The theory is that he is a "native" of a country with which the United States is at war.

Relator has made three previous applications for relief similar to that now

sought. The first two were in the form of orders to show cause why a writ of habeas corpus on his behalf should not be issued. They came before the United States District Court for Northern California, and on each occasion the writ was refused. See Ex parte Gregoire, 61 F.Supp. 92.

Thereafter, and when Gregoire had been brought within this jurisdiction, he asked for and obtained a writ. When brought into court, he is said to have been denied leave to prepare, serve and file a traverse to respondent's return to his petition. I am told that he was also denied the right to have a stenographer take minutes of the proceedings. His request to submit evidence in support of his petition was also denied. The writ was thereupon dismissed. The basis of this action was (1) that such application was predicated on facts that were before the court in the California proceedings; (2) that the writ was premature in that it had issued prior to the service on relator of the order for his removal from the United States; (3) that there had been no substantial change in the circumstances surrounding his detention which would justify a hearing on the merits of his petition; and (4) that he had not appealed from the decision made against him in the District Court for Northern California.

From the order dismissing that writ, relator took an appeal to the Court of Appeals for this Circuit, and the same is pending there at the present time.[1] Notwithstanding all this, relator presented me with a petition for a writ. The grounds on which he claimed to be entitled thereto were (1) that, subsequent to his former petition, he was served with an order for his removal from the country, and that the same is illegal in that he is a native and citizen of France, and not of Germany; (2) that the government had failed to comply with Sections 22 and 23 of Title 50 U.S.C.A., in that relator was not actually allowed time within which to leave the country, and that no court determination of the validity of the removal order had been had, and (3) that the Attorney General had exceeded the powers delegated to him by the President in finding that relator had adhered, as charged against him, to an enemy government, or to the principles thereof. Relator contended that since no court has passed on that issue, he had been denied due process of law.

When relator's petition first came before me, I viewed the same with askance. My thought was that he had had his day in court, and that his case should not have further consideration here. When, however, my attention was called to the fact that one reason for the dismissal of relator's former writ was that it was premature (which it is not now), and was apprised in addition that relator had at no time been permitted to be personally heard, I felt that a new writ should issue. Indeed, in the light of the latter circumstance, it seemed that, under the decision in Walker v. Johnston, 312 U.S. 275, 61 S.Ct. 574, 578, 85 L.Ed. 830, the issuance of a writ was little short of mandatory. In the decision of that case, Mr. Justice Roberts said:

"The District Court proceeded to adjudicate the petitioner's right to the writ upon the allegations of his petition and traverse and those of the return and accompanying affidavits. Thus the case was disposed of on ex parte affidavits and without the taking of testimony. The practice thus to dispose of applications for habeas corpus on matters of fact as well as of law has been followed in the Ninth and Tenth Circuits.

"In the other circuits, if an issue of fact is presented, the practice appears to have been to issue the writ, have the petitioner produced, and hold a hearing at which evidence is received. This is, we think, the only admissible procedure. Nothing less will satisfy the command of the statute that the judge shall proceed 'to determine the facts of the case by hearing the testimony and arguments.'"

Respondent's return to the writ thus authorized is to the effect that relator, having been born in Metz, Germany, on October 9, 1894, is a native, citizen, denizen or subject of Germany, and hence an alien enemy, who is subject to Section 21 of Title 50 of the United States Code Annotated, and to

---

[1] For decision, see 157 F.2d 433.

Presidential Proclamation No. 2526. The return, after setting forth the proceedings that had heretofore been had, denies that relator is entitled to be released from custody. It admits, nevertheless, that relator "legally entered the United States on his French passport and on a French quota immigration visa, in March, 1941, and is a legal resident of the United States."

At the time the writ came on to be heard Mr. Axman, Assistant United States Attorney, on behalf of respondent, arose and said:

"May it please your Honor; if I may, the relator is the moving party here, but the object of the government today will be to try to present to your Honor its position by way of argument, that this matter should not be turned into a hearing, which your Honor has said he was disposed to do. And if your Honor will hear me briefly on that point, that will be the government's entire position today; and I do not intend, should your Honor overrule me, to participate in any hearing in the nature of cross-examination or evidence. * * * I should like to make my argument because that is our entire position, that this hearing should not proceed."

Mr. Axman proceeded to say that I was without authority to review the determination of the Attorney General to the effect that Gregoire is an "Alien enemy who is dangerous to the public peace and safety of the United States because he has adhered to a government with which the United States is at war, or the principles thereof."

At the conclusion of the argument, I directed the hearing to proceed, and heard the testimony offered by relator. A detailed summary of its content need not be stated. It is sufficient to say that in his early youth, relator attended elementary schools in Metz and in Alsace. His higher education was received at Oxford and Heidelberg. Thereafter, he studied law at the French University of Strasbourg. In 1914, at the age of 20 years, he was conscripted into the German Army. In November of that year, he was taken prisoner by the Russians, and remained their captive in Siberia until 1917. He was then exchanged as an invalid and spent considerable time in Finland. At the time of the Armistice of 1918 he was back in Lorraine. He subsequently returned to the University of Strasbourg, where he completed his law course, and was later admitted to the practice of his profession at Metz. Thereafter, he went to Paris and there practiced law until his departure for the United States in 1941.

Relator has twice been married, the first time in 1921. This union was dissolved in 1936. In 1937, he married an American girl whose home was in California. In May of 1940, his wife being pregnant, desired her child to be born in the United States. Relator took her to Italy, where she embarked for America, eventually reaching her former home. A girl child was born of this marriage on November 29, 1940. Relator could not accompany his wife to America because of the fact that he belonged to the French Second Military Reserve, and could not easily obtain an exit visa from France. However, after the German occupation of Paris in June of 1940, this difficulty was obviated, and in March of 1941, he came to the United States. In the meantime he practiced law in Paris, and had occasion to represent his clients before the German authorities. So far as is indicated in the hearing held before me, he did not improperly collaborate with them. As a matter of fact, in the winter of 1939-1940, at the behest of the French Intelligence Service, he made a mission to Switzerland on its behalf.

Between the date of relator's arrival in this country and January 5, 1942, when he was arrested by agents of the Federal Bureau of Investigation, he seems to have lived quietly, and to have engaged in no subversive activities. It must be said, however, that suspicion rested upon him as having done so. In more than one instance, he was accused of being a French Fascist leader, and an anti-Semitic propagandist. As to whether these accusations were just or otherwise is a matter on which I do not and cannot pass. Neither can I say whether relator has, as the Attorney General has declared, adhered to the German Government or its principles. In United States ex rel Schwartzkopf v. Uhl, 2 Cir., 137 F.2d 898, 900, the court said:

"With the attorney general's finding that restraint of the appellant is required

as a measure of public safety the courts have no concern. (Cases cited.) As these cases show, the relator's writ of habeas corpus can raise only the question whether he is an alien enemy within the statutory definition, that is, whether he is a 'native, citizen, denizen or subject' of Germany."

 On the strength of this holding by the Appellate Court for this Circuit, each and every contention of relator, excepting that having to do with his status as an alien, will be overruled. See, also, United States ex rel Schlueter v. Watkins, D.C., 67 F.Supp. 556, decided by Judge Rifkind. It is open, perhaps, to question whether I should even undertake to decide if relator is or is not an alien enemy. That he is such was the holding of Judge St. Sure in Ex parte Gregoire, D.C., 61 F.Supp. 92. Due, however, to the possible irregularity of that proceeding, and also to the fact that a former decision in a habeas corpus case is not always to be regarded as res adjudicata, I think the relator is entitled to the benefit of my independent judgment on the sole matter with which I can deal. Salinger v. Loisel, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989; United States ex rel. Bruno v. Reimer, 2 Cir., 103 F.2d 341.

Coming then to the point at issue, it is to be observed that Judge Vogel, in the case of United States ex rel. Umecker v. McCoy, D.C., 54 F.Supp. 679, 682, flatly held that a man who was born in 1893 at Wickersheim, Alsace, was to be regarded as a native of that province, rather than a native of Germany. He said:

"If we *now* recognize that *place* (Alsace) as being a part of France we must, then, in order to give proper meaning to the word 'native', recognize him as being a native of France."

In so holding, Judge Vogel relied, in part at least, on United States ex rel. D'Esquiva v. Uhl, 2 Cir., 137 F.2d 903, 905. In the course of the opinion there rendered, Judge Clark, speaking arguendo for the Court of Appeals for this Circuit, said:

"Thus, a native of Prussia before the German Empire was proclaimed in 1871 would now be a native of Germany. And an Alsatian should not be held subject to detention as an alien enemy merely because (unlike other members of his family, for example) he happened to have been born after the original cession of Alsace to Germany and prior to its return to France in 1919. * * * Nor should changes in the composition of the nation—the adding or subtracting of part, as with France and Germany in 1919, or the substitution of a federated republic for the empire, Germany, 1919—make a discontinuity so that a native of the former nation is to be considered not now a native of the succeeding and present nation."

The Government here argues that this statement is merely obiter dicta and that is not only wrong in theory but contradictory to other portions of the opinion, and should, therefore, be disregarded. It is interesting to note, nevertheless, that the government dismissed its appeal from the holding of Judge Vogel in the Umecker case, supra. It is also worthy of comment that the United States in its brief in the D'Esquiva litigation had this to say:

"* * * In determining the country of nativity, the courts have held the country which is, at the time of deportation, the sovereign over the place of birth is the country of nativity, irrespective of changes of sovereignty since the time of birth. * * *"

On that theory, the Court was asked to hold that a person born in a foreign country need not also have been born within allegiance of that government in order to be a "native" thereof within the meaning of the Alien Enemy Act. The phrase "natives * * * of the hostile nation," as used in such Act must include, said the Government, a person born of native-citizen parents at a place now recognized by the United States as a component part of a nation with which the United States is at war. That the argument there made is inconsistent with the one here advanced seems obvious. The reason for the discrepance is without explanation.

But, be this as it may, I shall follow the decision of Judge Vogel in the Umecker case, supra, together with the above quoted dicta from the D'Esquiva opinion. Fur-

thermore, such ruling seems to me to be demanded by the terms of the Treaty of Versailles, which became operative on January 10, 1920. Under its provisions, Alsace and Lorraine were restored to French Sovereignty, and since that time the United States has continuously recognized these territories as a part of France. Although all natives or inhabitants of these areas did not by virtue of the treaty become entitled to be regarded as Frenchmen, the fact is that relator under its terms did become a citizen of France. In this connection it is appropriate to note the language of Section V of the Treaty. It reads, in part, as follows:

"The High Contracting Parties, recognizing the moral obligation to redress the wrong done by Germany in 1871, both to the right of France and to the wishes of the population of Alsace and Lorraine, which were separated from their country in spite of the solemn protest of their representation at the Assembly of Bordeaux,

"Agree upon the following Articles:

"Article 51.

"The territories which were ceded to Germany in accordance with the Preliminaries of Peace signed at Versailles on February 26, 1871, and the Treaty of Frankfort of May 10, 1871, are restored to French Sovereignty as from the date of the Armistice of November 11, 1918.

"The provisions of the Treaties establishing the delineation of the frontier before 1871 shall be restored.

\* \* \* \* \*

"Article 53.

"Separate agreements shall be made between France and Germany dealing with the interests of the inhabitants of the territories referred to in Article 51, particularly as regards their civil rights, their business and the exercise of their professions, it being understood that Germany undertakes as from the present date to recognize and accept the regulations laid down in The Annex hereto regarding the nationality of the inhabitants or natives of the said territories, not to claim at any times or in any place whatsoever as German nationals those who shall have been declared on any grounds to be French. \* \* \* ".

In my opinion this portion of the Treaty, to which the United States is signatory, should be held to have raised the bar sinister that held ╻relator to be a native of Germany from the date of his birth until the day of his liberation from allegiance to Germany. With the full approbation of the United States, he was then endowed with all the rights, privileges and immunities that belong to a native-born citizen of France. It follows, I think, that this country is without authority to deprive him of his liberty upon the theory that, having been born in conquered territory that has long since been restored to France, he cannot claim the rights that attach themselves to native-born Frenchmen.

Relator's writ is sustained, and he will be released from custody.