**CARLSON v. LANDON.**

No. 12742.

United States Court of Appeals
Ninth Circuit.

Dec. 16, 1950.

Margolis & McTernan and John W. Porter, all of Los Angeles, Cal., for appellant.

Ernest A. Tolin, U. S. Atty., Walter S. Binns, Asst. U. S. Atty., Los Angeles, Cal. (Howard L. Field, Dist. Adjudications Officers, Imm. & Nat. Service, Los Angeles, Cal., on the brief), for appellee.

Before STEPHENS, HEALY and BONE, Circuit Judges.

STEPHENS, Circuit Judge.

Frank Carlson is being held in custody without bail, as a deportable alien, by Herman R. Landon, District Director of the Immigration and Naturalization Service, United States Department of Justice (called herein Director). He seeks his liberty on reasonable bail through the petition for the writ of habeas corpus by his attorney. Since Carlson is referred to in the record as the petitioner we shall follow that practice.

Petitioner was arrested and is being held under a warrant issued by Landon upon instruction of the Attorney General of the United States, dated in October, 1950 (called herein the 1950 warrant), in which it is stated: "The Act of Oct. 16, 1918, as amended [by Internal Security Act of 1950 (ch. 1024, Pub.Law 831)] in that he has been, after entry, a member of the following class set forth in Section 1(2) (c) of said Act [8 U.S.C.A. § 137(2) (C)]: An alien who was a member of the Communist Party of the United States," and in which it is provided: "Pending determination of deportability, the alien named is to be continued in custody. This warrant supersedes that issued on the 20th day of October, 1947." [called herein the 1947 warrant]

At the time of service of the 1950 warrant, petitioner was at liberty under bail

which he had posted after his arrest under the 1947 warrant wherein he was charged with being a member of an organization which believes in and advocates violence to overthrow the Government of the United States (Im. Act of Oct. 16, 1918), and deportable. The bond mentioned was "revoked" soon after or before service of the 1950 warrant. Apparently the charge under the 1947 warrant has been abandoned, or, rather, it has been merged in the proceeding under the 1950 warrant.

The district court issued its order to show cause in the habeas corpus proceedings and the Director returned that he held petitioner upon the terms of the 1950 warrant and upon the allegation that there was "reasonable cause to believe" that petitioner's release would be prejudicial to the public interest and would endanger the welfare and safety of the United States. Petitioner answered, alleging that the return was no sufficient justification and that the restraint without bail is without authority of law and that he has never been informed of any act which it is feared he may commit and that there is no cause for believing that he would commit any act of prejudice against the welfare of the United States and that he has repeatedly requested the Director to inform him as to what he has done or what it is feared he would do upon his release but that no answer has been forthcoming.

Petitioner further alleges that he was born in Poland in 1913 and entered this country at the age of 6 years, has lived in California for the last 15 years and prior to deportation proceedings had filed his application for citizenship; he is married and is the father of two California-born minor children; there is no basis for fearing that he will commit any act detrimental to the United States should he be freed on bail; the deportation proceedings are liable to continue for many months; he will hold himself in readiness to appear at any and all sessions of hearings on the warrant and he has responded at all hearing sessions on the warrant of 1947 while at liberty under bail; the Internal Security Act of 1950 is unconstitutional as violative of the Fifth Amendment. Although the petitioner does not do so, Miriam Christine Stevenson in a companion case to which we allude in Note 4 contends that the United States' adherence to the United Nations has something to do with the issues of this case.

■ It is provided by the Internal Security Act of 1950, under which the 1950 warrant was issued, in Section 23 that: "Pending final determination * * *, such alien may, in the discretion of the Attorney General (1) be continued in custody; or (2) be released under bond * * *." Correctly, as we hold, the court decided that this provision does not give the Attorney General or the Director absolute and final power to deny bail. Instead, the court held that the language quoted was but a clarification of language in Section 156, Title 8 U.S.C.A., of which it was amendatory, and left bail to the discretion of the Attorney General rather than to his unlimited power to deny it, and cited United States ex rel. Zapp v. District Director of Immigration and Naturalization, 2 Cir., 1941, 120 F.2d 762, and United States ex rel. Potash v. District Director of Immigration and Naturalization, 2 Cir., 1948, 169 F.2d 747.[1] These cases were decided under the section before the 1950 amendment and held that the Attorney General's discretion was not

---

1. It is said in United States ex rel. Potash v. District Director of Immigration and Naturalization, 2 Cir., 1948, 169 F.2d 747, at page 751: "The foregoing decisions and also, as it seems to us, the general spirit of our institutions make it improbable that Congress intended to give the Attorney General unlimited power over the admission to bail of aliens against whom deportation proceedings are brought. We think that it requires more than the general grant of power to fix bail in Section 156 to exempt the Attorney General from all control in the exercise of that function even if he should be shown to have acted in an arbitrary manner. This interpretation is particularly indicated in such a situation as the present where personal liberty is involved and there has been no determination that the alien is deportable."

absolute but could be reviewed as to its reasonableness.

We agree. And we add, the very fact that the Attorney General (or his assistants) has the power to grant bail before a deportation hearing or refuse it, carries with it the necessity of exercising discretion and certainly discretion must be based upon some phase of fact. It will be noticed that the Director's return contains a statement that there is "reasonable cause to believe" that petitioner's release would be prejudicial to the United States, a statement which connotes the exercise of discretion.

At the hearing the court invited petitioner to proceed to show facts relative to the issue of abuse of discretion but he declined to do so stating that he had alleged facts on the relevant issues which had not been denied. Thereupon the court dismissed the petition, holding that there had been no showing as to abuse of discretion. We think the court erred at this point.

 It is well settled that there is no absolute right of an alien to be accorded bail after the service of a warrant for deportation and it is equally well settled that there is no absolute right of an alien to remain in this country. At the same time it is not claimed in this case, as the law now stands, that a legally admitted alien can be deprived of his liberty without good cause therefor as measured by the applicable law or that he can be deported without due process of law. Under statute and warrant of authorization, designated United States immigration officers may intercept individual aliens and subject them to hearings for the purpose of determining whether they are deportable and restrain them of their liberties for enforced deportation after hearing, but detention for long and unreasonable periods before hearing is illegal. There is an admirable collection of authorities upon most if not all of these fundamental points in Skeffington, Immigration Com'r v. Katzeff, 1 Cir., 1922, 277 F. 129. With these generalizations in mind, we turn to the specific law under which petitioner is being held. But first as to the inducing causes for the enactment of the Security Act of 1950.

From the beginning of their civilized history, the American continents have been viewed by oppressed peoples as the lands of freedom and opportunity. Notwithstanding occasional acts of oppression and the now happily abolished practice of human ownership, the governments established in the New World have provided freedom and opportunity to the individual. It is fixed in the Constitution of the United States that individual right to liberty under due process of law is the prime end and concern of established governments. But charters are not self-executing and the old spiritually awakening cry of "Eternal Vigilance is the Price of Liberty" is never an outworn cliche.

The vision of freedom and opportunity has beckoned to our shores many law-abiding level-headed people eager to understand and practice our way of living while others have come full-charged with misconceived notions of their own unsuited to the American scheme of government, often centered upon license with little restraint. Others have come with treacherous plans to replace our form of government with age-old tyrannical rule or with anarchistic disruption of law and order.

Only in the last few years, however, a powerful foreign government, one for whose liberation from a world-dictator-plan we only recently sacrificed our sons and our treasure, has sought by stealth and abandon of morals and gratitude, to obstruct, disrupt, and over-throw our government and erect upon its ruins a branch of its own dictator absolutism. The eternal war of dictator dominance over the rightful liberties of the individual has flared into a consuming flame imposing upon this generation the duty of smothering it to impotence by sacrifices we little realize. And this appalling duty must not be served by fighting to a victory which in itself will be a defeat for the principles we fought for.

With these unpleasant truths showing plainly above the sea of unrealistic al-

truism, Congress put up the bars to immigration and provided rules for expulsion of the destructionists from our country. In the early part of 1950 Congress gave especial attention to the growing, dangerous fact that aliens in our midst were conspiring with naturalized and native-born citizens in prostituting the American political party system by affecting to act within it through a so-called Communist Party of the United States. It enacted the Internal Security Act of 1950 (Ch. 1024, Pub.Law 831 [H.R. 9490]) in which it is stated:

"Sec. 2. As a result of evidence adduced before various committees of the Senate and House of representatives, the Congress hereby finds that—

"(1) There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization.

"(2) The establishment of a totalitarian dictatorship in any country results in the suppression of all opposition to the party in power, the subordination of the rights of individuals to the state, the denial of fundamental rights and liberties which are characteristic of a representative form of government, such as freedom of speech, of the press, of assembly, and of religious worship, and results in the maintenance of control over the people through fear, terrorism, and brutality.

"(3) The system of government known as a totalitarian dictatorship is characterized by the existence of a single political party, organized on a dictatorial basis, and by substantial identity between such party and its policies and the government and governmental policies of the country in which it exists.

"(4) The direction and control of the world Communist movement is vested in and exercised by the Communist dictatorship of a foreign country. * * *" 50 U.S.C.A. § 781.

Following these statements of proven facts the Act sets out the methods followed and practiced by the destructionists. All of these should be carefully read and pondered by the so-called well-intentioned intellectuals, fellow-travelers and parlor-Communists. Then follows the statement immediately striking the instant case:

"(13) There are, under our present immigration laws, numerous aliens who have been found to be deportable, many of whom are in the subversive, criminal, or immoral classes who are free to roam the country at will without supervision or control.

"(14) One device for infiltration by Communists is by procuring naturalization for disloyal aliens who use their citizenship as a badge for admission into the fabric of our society.

"(15) The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when * * * overthrow of the Government of the United States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. * * *"

There is more which we need not quote.

Out of this moving factual appraisal of an outstanding conspiracy of aliens and a few mentally intoxicated or drugged citizens and a sprinkling of the vicious, directed by a foreign government, came the authority of Congress to the Attorney General of the United States in his capacity as official head of immigration and naturalization activities to deport aliens who, any time since their entry, have been members of the Communist Party of the United States.[2]

2. Since aliens have no franchise to vote but, as it appears, nevertheless may be members of the Communist Party, that organization is not solely a political party in the sense that we ordinarily use that term.

■ We pass as wholly unmeritorious the contention that the Act is unconstitutional as to the issues here. And the startling contention by a petitioner in a companion case[3] that the United Nations has taken over in the field of immigration and alien law need not divert us from the consideration of the United States as a sovereign state. We come to the central point of the case.

■ Habeas corpus, as we know, is civil in nature and the petitioner bears the burden of proving that his detention is illegal upon regular process being shown for the detention. We have already said we agree that it was the duty of the Attorney General or his assistant in the immigration service to admit petitioner to bail pending the habeas corpus proceedings unless he had good reason for refusing it, although it is arguable from the facts upon which Congress acted that it meant to clothe the Attorney General with the unrestricted power to hold the alien without bail. So far as we are informed, the several United States district and appellate courts which have spoken on the subject have agreed that the Act cannot be so construed. The return to the Show Cause reveals the warrant as regular and its authenticity is not disputed. Petitioner declined to produce evidence but at this juncture of the case it will not do to say that he has failed entirely.

At the close of the hearing on the order to show cause, the parties stipulated and the judge acted under the stipulation that " * * * it is deemed that a writ of habeas corpus has been issued and that the hearing has been had upon a return to the writ. For said purpose the Return to the Order to Show Cause Why Petition for Writ of Habeas Corpus Should Not Be Granted and the Answer (sic) thereto are deemed the return and traverse to the writ. The determination upon this hearing shall be either that the writ is granted or that the writ is discharged."

■ There is no denial of petitioner's allegations as to residence, family status, his attendance upon hearings under the 1947 warrant, and these allegations must be taken as true. See In re Smith, 1904, 143 Cal. 368, 77 P. 180; Daly v. Elton, 1904, 195 U.S. 242, 25 S.Ct. 22, 49 L.Ed. 177; Whitten v. Tomlinson, 1895, 160 U.S. 231, in which at page 242, 16 S. Ct. 297, at page 302, 40 L.Ed. 406, it is said: "In a petition for a writ of *habeas corpus,* verified by the oath of the petitioner, * * * facts duly alleged may be taken to be true, unless denied by the return, or controlled by other evidence. But no allegation of fact in the petition can be assumed to be admitted, unless distinct and unambiguous."

■ It would seem, therefore, that the return is insufficient when laid beside petitioner's undenied allegations, for the reason that petitioner has gone about as far as he could go to prove his claim that his release will not prejudice the United States. If there is good reason for the action of the Director in denying bail it is locked in the Director's own chest of knowledge and is unrevealed for proof against it. Surely, in this circumstance, petitioner is not burdened by the impossible task of imagining and refuting causes which may have had a bearing upon the Director's discretion unless it is true that he is a bad risk, and the trial court could not judicially conclude that he was such merely upon the Director's say so. What more could petitioner have alleged in his answer or petition or could have attempted to prove at the hearing? A man's liberty is very different from a property right in an ordinary civil action and, although it is hornbook to say that habeas corpus is in nature a civil action, it remains that it deals in personal liberty as effectually as a criminal action. So far as our knowledge goes we know of no proceeding outside of the war powers which keeps a man imprisoned without a hearing as to the cause. See United States v. Grayson, 2 Cir., 1948, 166 F.2d 863; United States ex rel. Schlueter v. Watkins, D.C. 1946, 67 F.Supp. 556, 560, affirmed 2 Cir., 1946, 158 F.2d 853. In 1 Greenleaf on Evidence 154 § 79 (16th ed. 1899) it is said: "* * *

3. We mention this because we refer to this opinion in that case.

where the subject matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true, unless disproved by that party. * * *"

But the Director is wrong in assuming that petitioner is arguing to a point inconsistent with the principal that a petitioner in habeas corpus has the burden of showing that his detention is legally wrongful. In this phase of the case petitioner is not here questioning the sufficiency of the warrant or the return thereon as to its authenticity. He is not questioning the due process leading to the issuance of a warrant to a prison warden upon conviction and sentence after a court trial of facts, as is the case in a habeas corpus proceeding related to a criminal case. He is contesting the legality of his detention upon the ex parte finding of the Director and of the Director's order thereon which is a part of the Director's return. There is no return at all made upon this, the real issue here, except the criptic statement that the Director has information leading him to believe that petitioner's release would be harmful to the country. If the Director is given the power to use his discretion but that such discretion must not be abused, and the trial court so held and we agree, then the Director's return, to be good, must state some fact upon which a reasonable person could logically conclude that the denial of bail is required to protect the country or to secure the alleged alien's presence for deportation should an order to that effect be the result of the hearing. Without this much, the return is insufficient unless it is supplemented by affidavits or with evidence at the habeas corpus hearing, and this has not been done. In this situation the burden of the petitioner is not shifted to the Director and the Director is not required to "show his hand." All he must do is to assert fact, not conclusion, as the basis for his action. The truth of the Director's reasons for denying bail if at all reasonable is not triable by the district court in habeas corpus any more than the truth of allegations in a criminal charge is decided by a magistrate in a preliminary hearing. But whether there is factual reason back of the action must be shown in either proceeding. The imagination can hardly create a situation more incompatible with the spirit of our institutions than that one civil official's completely secret viewpoint could be the basis of sustained imprisonment.

If the Director's action was upon the theory argued in the briefs, but which was correctly rejected by the trial court, that there is no question of discretion in the case, that the Director, under instruction from the Attorney General, can hold or release the alien without revealing his reason for the choice, most of this opinion is surplusage. No doubt the uncertainty mentioned will be cleared up in the hearing which we order in the next paragraph.

The judgment is reversed and the cause is remanded with direction to the district court to take the undenied material allegations of petitioner's answer as true and to give the Director an opportunity to reveal reasons for exercising his discretion, if he did exercise discretion in denying bail, and to take note of facts relating to delays in the deportation hearings, and decide the issue upon such evidence and any other proper evidence which may be offered and received [4] all in conformity with this opinion.

Reversed and remanded.

4. The record shows that the decision was had upon the hearing of the Show Cause order but it was stipulated that the judgment should be as though the writ issued.

There are three companion cases (appealed from the same court at Los Angeles) to the one specifically treated in the text of this opinion and the facts and issues are so similar that little attempt to discuss the applicable law is made in our treatment of them. They are: Stevenson v. Landon; Hyun v. Landon; and Carlisle v. Landon, 186 F.2d 190.

There are two cases appealed from the District Court for the Western District of Washington which present like questions of law upon comparable but somewhat different facts. They are: Mangaoang v. Boyd (Sasieff v. Boyd), 9 Cir., 186 F.2d 191.