**UNITED STATES ex rel. SCHWARZKOPF
v. UHL, District Director of
Immigration.
No. 296.**

Circuit Court of Appeals, Second Circuit.

Aug. 18, 1943.

Bennet, House & Couts, of New York City (William S. Bennet, Victor House, John F. Couts, and Bernard A. Finkel, all of New York City, of counsel), for appellant.

Mathias F. Correa, U. S. Atty., and Samuel Brodsky and Stuart Z. Krinsly, Asst. U. S. Attys., all of New York City, and Edward J. Ennis, Director, Alien Enemy Control Unit, Department of Justice, and Leo Gitlin, Atty., Department of Justice, both of Washington, D .C., for appellee.

John W. Davis, of New York City, for Austrian Action, Inc., as amicus curiae.

Before SWAN, CHASE, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

Acting under the presidential proclamation of December 8, 1941, No. 2526, 6 Fed. Reg. 6323, promulgated pursuant to the Act of July 6, 1798 as amended, 50 U.S.C.A. § 21, agents of the Department of Justice arrested the relator as an alien enemy. An Alien Enemy Hearing Board recommended that he be interned, and the acting attorney general so ordered. To test the legality of his detention, the relator sued out a writ of habeas corpus. Argument thereon was heard May 12, 1942 and, without opinion, the writ was forthwith dismissed and the relator remanded to custody; but the order of dismissal was not entered until November 14, 1942, two motions by the relator for reargument having been made and denied in the meantime. This appeal followed promptly upon entry of the order.

The procedure upon the argument of the case in the district court was unusual. Although the respondent's return denied

some of the allegations of fact in the petition, the relator was afforded no opportunity to file a traverse until after announcement by the court of its decision of dismissal. The order as entered refers to certain concessions made by the United States Attorney and recites that the court has determined, "on the basis of the allegations set forth in the petition and on the letters of the Secretary of State annexed to the return, that the relator is a citizen of Germany within the meaning of Section 21, Title 50, United States Code." The allegations of the petition are in direct conflict with at least one of the letters of the Secretary of State. This expressed the Secretary's opinion that "Mr. Schwarzkopf should be regarded as a German citizen or subject." The petition alleges that he is neither a citizen nor subject of Germany. Since issues of fact existed, it would appear that the relator was entitled to file a traverse and have a hearing of testimony before the court disposed of the writ. 28 U.S.C.A. §§ 460, 461; Walker v. Johnston, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; Holiday v. Johnston, 313 U.S. 342, 550, 61 S.Ct. 1015, 85 L.Ed. 1392; Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L. Ed. 1302. But we do not find it necessary to remand the case for trial because the respondent's brief in this court concedes all the material facts alleged in the relator's petition. Both parties desire the merits of the controversy to be determined upon the conceded facts.

Briefly stated they are as follows: The relator is a Jew born in 1886 in the city of Prague, Bohemia, which was then within the Austro-Hungarian Empire. In 1919 Prague became part of Czechoslovakia and the relator became a citizen of that country. In 1925 he became a citizen of the German Republic by naturalization, being then in business in Berlin. In 1927 he removed from Germany to the Austrian Tyrol and in 1933 became a naturalized citizen of Austria, his former German citizenship being thereby automatically terminated. In October 1936 he arrived in the United States for permanent residence as a quota immigrant under the Czechoslovakian quota. When Hitler's forces invaded Austria in March 1938, the relator was resident in the United States and on June 17, 1938, he declared his intention to become a United States citizen. He applied for naturalization on September 26, 1941. This application was pending when he was taken into custody as an alien enemy on December 9, 1931.

The legal question for decision is whether the conceded facts bring the appellant within the class of aliens whose restraint is authorized under the statute, 50 U.S.C.A. § 21, and the presidential proclamation pursuant to which he is held. That statute provides that: "Whenever * * * any invasion or predatory incursion is * * * threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." The President is authorized to direct "the manner and degree" of their restraint "and in what cases," and "to establish any other regulations which are found necessary in the premises and for the public safety." On December 8, 1941, the President issued Proclamation No. 2526, published in 6 Fed.Reg. 6323, by which he proclaimed that "an invasion or predatory incursion is threatened upon the territory of the United States by Germany," and directed the attorney general to cause the apprehension of such alien enemies as in his judgment are subject to apprehension under regulations incorporated in the presidential proclamation.

With the attorney general's finding that restraint of the appellant is required as a measure of public safety the courts have no concern. United States ex rel. De Cicco v. Longo, D.C.Conn., 46 F.Supp. 170; Ex parte Risse, D.C.S.D.N.Y., 257 F. 102; Ex parte Gilroy, D.C.S.D.N.Y., 257 F. 110; Ex parte Fronklin, D.C.N.D. Misc., 253 F. 984; Minotto v. Bradley, D.C.N.D.Ill., 252 F. 600; Ex parte Graber, D.C.N.D.Ala., 247 F. 882. As these cases show, the relator's writ of habeas corpus can raise only the question whether he is an alien enemy within the statutory definition, that is, whether he is a "native, citizen, denizen or subject" of Germany.

The United States attorney relies solely on the word "citizen." He argues that the relator was an Austrian citizen on March 13, 1938, the date of the annexation of Austria by Germany, and became a German citizen by virtue of the German decree

of July 3, 1938, which granted German citizenship to all Austrian citizens; that the United States has recognized the de facto sovereignty of Germany over the territory formerly Austria, and our courts must recognize and give effect to the German decree of July 3rd. It is further contended that our courts must disregard the German "Executive Order" of November 25, 1941 which purports to deprive Jews residing abroad of German citizenship and to subject their property to confiscation.

It is not claimed that the United States has accorded de jure recognition to Germany's annexation of Austrian territory. Clearly no such claim could be successfully asserted in view of the public declaration by the Secretary of State that "This Government has never taken the position that Austria was legally absorbed into the German Reich." [1] The claim that de facto recognition has been given is rested chiefly upon two notes which the Secretary of State delivered to the German foreign minister on April 6, 1938. One of the notes recited that on March 17, 1938 the Austrian minister had informed the Department of State that Austria had ceased to exist as an independent state, the Austrian ministry to this country had been abolished and its affairs had been taken over by the Embassy of Germany. It was then stated that "The Government of the United States finds itself under the necessity as a practical measure of closing its Legation at Vienna and of establishing a Consulate General," and "provisional consular status" was requested for certain named persons. The other note referred to Austrian indebtedness to the United States and said: "This Government will expect that these obligations will continue to be fully recognized and that service will be continued by the German authorities which have succeeded in control of the means and machinery of payment in Austria. * * *" The respondent's brief also directs attention to Executive Proclamation No. 2283 of April 28, 1938, which increased the German immigration quota to include the quota formerly allocated to Austria; to a letter of instructions dated February 19, 1939, in which the Commissioner of Immigration and Naturalization stated that former Austrian citizens, "who automatically became German citizens by the turn of events on March 13, 1938" should renounce "The German Reich" in petitioning for naturalization; and to Local Board Release No. 112 of March 16, 1942, in which the National Director of the Selective Service System listed among enemy countries, "Germany including Austria." In view of the statement of July 27, 1942, by the Secretary of State, already quoted, as well as our country's obligations under the Kellogg-Briand Treaty, known officially as the Pact of Paris, the appellant and the amicus curiae argue earnestly that the above mentioned facts do not constitute recognition of Germany as the de facto sovereign of the territory formerly Austria.[2] As to what constitutes de facto recognition they cite 1 Hackworth, Digest of International Law, 175. No decision of this dispute is presently required. Cf. Land Oberoesterreich v. Gude, 2 Cir., 109 F.2d 635, 637, certiorari denied 311 U.S. 670, 61 S.Ct. 30, 85 L.Ed. 431. Even if de facto recognition be assumed it does not follow that it affects the nationality of those under the domination of the de facto power (1 Hackworth, Digest of International Law, 377-383) or that the relator thereby becomes a citizen of Germany within the meaning of a statute of the United States. Indeed, in our view, the dispute as to recognition or non-recognition by the United States of the conquest of Austria raises a wholly irrelevant issue.

The issue for decision is whether the relator is a "citizen" of Germany within

---

[1] The Secretary's statement was made on July 27, 1942 and was released to the press by the Department of State on the same date.

[2] To offset the departmental measures cited by the respondent, they point to Executive Order No. 8785 issued June 14, 1941, 12 U.S.C.A. § 95 note, which schedules Austria "or any nationals thereof" apart and distinct from Germany; to the Department of Justice releases of February 8, 1942 and June 11, 1942, permitting Austrians who registered themselves erroneously as Germans in 1940 to correct their registration; to the fact that on November 14, 1942 the Secretary of War approved the creation of an Austrian unit in the United States Army "to demonstrate the determination of this country to free Austria from Axis domination"; and to the letter of May 18, 1943 appended to the brief of the amicus, in which the deputy Commissioner of Immigration states that Austrian citizens who have never voluntarily acquired German nationality are not alien enemies under 8 U.S.C.A. § 726.

the meaning of the Alien Enemy Act. The obvious purpose of that Act was to include within its ambit all aliens who by reason of ties of nativity or allegiance might be likely to favor "the hostile nation or government" and might therefore commit acts dangerous to our public safety if allowed to remain at large. Congress selected the words "natives, citizens, denizens, or subjects" as an all inclusive description. In determining who are "citizens" of a foreign nation our courts must consider not only the municipal law of the foreign nation but also the accepted rules and practices under international law. If the relator's citizenship be tested by the municipal law of Germany—disregarding for the moment the cancellation of his German citizenship by the November 1941 "Executive Order"— the claim that he is a citizen of Germany must be based upon the conquest and annexation of Austria and the decree of July 3, 1938 granting German citizenship to all citizens of Austria. But under generally accepted principles of international law Germany could impose citizenship by annexation (collective naturalization) only on those who were inhabitants of Austria in 1938. This question is discussed in Oppenheim, International Law, 5th Ed., I, sec. 240. He states that it is the American view that only the "inhabitants" who "remain" in the territory, or by treaty are permitted to elect the new nationality, are to be deemed nationals of the annexing state. He then calls attention to a contrary opinion expressed by a Prussian court in 1868. There a cabinet minister of King George of Hanover left Hanover for Vienna, in company with the king, before the annexation of Hanover by Prussia in 1866. In 1868, while in Vienna, he was tried for high treason by a Prussian court in Berlin. This court held that he became a Prussian subject by reason of the annexation, but this view has been severely criticized as erroneous by several learned writers on the subject, and by none, so far as we know, has it been approved. See Professor Schoenborn's criticism in Strupp's Worterbuch des Volkerrechts, II, 271; and the views of Professors Zachariae and Newmann in Halleck, International Law, 4th Ed., II, 510. These commentators maintain that when territory is transferred to a new sovereign by conquest or cession the inhabitants of the territory become nationals of the new government only by their own consent, express or implicit. This generally accepted principle of international law has been recognized in the decisions of the Supreme Court. If the inhabitants remain within the territory their allegiance is transferred to the new sovereign. American Insurance Co. v. 356 Bales of Cotton, 1 Pet. 511, 542, 7 L.Ed. 242. If they have voluntarily departed before the annexation and have never elected to accept the sovereignty of the new government, their allegiance is not so transferred. Inglis v. Trustees of the Sailor's Snug Harbor, 3 Pet. 99, 122, 123, 7 L. Ed. 617; United States v. Repentigny, 5 Wall. 211, 260, 18 L.Ed. 627; Jones v. Mc-Masters, 20 How. 8, 20, 15 L.Ed. 805; Boyd v. Thayer, 143 U.S. 135, 162, 12 S.Ct. 375, 36 L.Ed. 103. See also Halleck, Int. Law, 4th ed., II, 506 et seq.; Hackworth, Digest Int. Law III, 346; Moore, Digest Int. Law III, §§ 379, 380 (presenting American treaty and diplomatic history in support of the view that only the inhabitants who elect to remain change their allegiance; Van Dyne, Naturalization, 275, 276 (confirming the treaty practice as evidence of the American political and legal view).

The respondent concedes the principle that an inhabitant of conquered or ceded territory can elect whether to retain his old nationality or accept the nationality of the new sovereign, but denies its applicability because there is no Austrian government in exile, as there is in the case of certain countries invaded by Germany, for example, Norway and Holland. Aside from the discredited Prussian case already mentioned, the only authority cited for such distinction is Brown v. United States, 5 Ct.Cl. 571, which does not, in our opinion, support it. On general principles of justice we think that civilized nations should not recognize the asserted distinction. If the invaded country has ceased to exist as an independent state there would seem to be all the more reason for allowing its former nationals, who have fled from the invader and established a residence abroad, the right of voluntarily electing a new nationality and remaining "stateless" until they can acquire it. In our view an invader cannot under international law impose its nationality upon non-residents of the subjugated country without their consent, express or tacit.

The statute under consideration was passed shortly after the American Rev-

olution and the members of the Congress which enacted it were certainly not unfamiliar with the fact that British subjects resident in the Colonies did not automatically become citizens of the United States but were accorded the right to elect to retain their former nationality if they removed themselves from this country. We cannot doubt therefore that the word "citizen" as used in the statute must be construed in the light of this accepted right of election. So construed the appellant is not a citizen of Germany within the meaning of the Act. More than a year before the German conquest he fled from Austria and came to this country for permanent residence, and nothing is shown to indicate that he has ever consented to accept the sovereignty of the invader.

Moreover, if we were to deny the relator the right of election and were to look solely to German law to determine his status, he would not be a German citizen. If it be assumed that he acquired German citizenship by the annexation of Austria and the decree of July 3rd, such citizenship was lost under German law in November 1941. There is no public policy of this country to preclude an American court from recognizing the power of Germany to disclaim Schwarzkopf as a German citizen. The cases relied upon by the respondent relate to giving effect to foreign confiscation of property having an American situs—an entirely different matter from conceding that a foreign state may determine for itself who shall have the rights and privileges of citizenship.[3] The statute does not authorize the apprehension and detention of all persons whose presence here may be found by the President to be dangerous to public safety. Unfortunately, even citizens of the United States or aliens owing allegiance to some friendly nation, may disregard their duty and commit acts favoring the enemy. But they cannot for that reason be held in custody under the statute in question. No more can the appellant. Upon the conceded facts he is not a German citizen and that is the only ground upon which the respondent justifies detention of him. The writ must be sustained and the appellant discharged from custody. It is so ordered.

[3] The cancellation of the citizenship of native born German citizens would not exclude them from the application of the Alien Enemy Act as they would still remain "natives" of Germany.