CITIZENS PROTECTIVE LEAGUE et al.
v. CLARK, Atty. Gen., of U. S.
(two cases).

REIMANN v. SAME.

Nos. 9193–9195.

United States Court of Appeals
District of Columbia.

Submitted April 4, 1946.

Decided May 2, 1946.

Mr. James J. Laughlin, of Washington, D. C., for appellants.

Mr. Thomas M. Cooley, II, of Waterford, Va., Attorney, Department of Justice of the Bar of the State of Michigan, pro hac vice, by special leave of Court, with whom Mr. Edward M. Curran, United States Attorney, and Mr. Sidney S. Sachs, Assistant United States Attorney, both of Washington, D. C., were on the brief, for appellee.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

These are appeals in three civil actions brought in the District Court of the United States for the District of Columbia for injunction, mandatory injunction and ancillary relief. Appellants are a non-profit organization "to insure equal rights for all and to safeguard the constitutional rights of all persons", and 159 individuals who are German nationals and who allege that they are threatened with deportation as alien enemies. Appellee is the Attorney General of the United States. Injunction having been asked upon the ground that the Alien Enemy Act is repugnant to the Constitution, application was made for the

designation of a three-judge court.[1] The Attorney General moved to dismiss in two of the actions and for summary judgment in the third. The District Court denied the application for a statutory court, granted the motions of the Attorney General, and dismissed the complaints on the merits.

All appellants say that the Alien Enemy Act of 1798[2] is unconstitutional. Appellants in No. 9193 say that the Act of 1798 has been repealed, at least by implication; that there is no legal basis for the attempted deportation, inasmuch as the United States is not now at war with Germany; that they have been guilty of no offenses against the United States subjecting them to deportation; that the board appointed by the Attorney General to conduct hearings is biased and partial and that it would be futile for appellants to appear before it; that they cannot be deported, by reason of the decisions of the Court in Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S. Ct. 1240, 88 L.Ed. 1525; Hartzel v. United States, 1944, 322 U.S. 680, 64 S.Ct. 1233, 88 L.Ed. 1534; and Bridges v. Wixon, 1945, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103. Nine of these appellants say that they were naturalized citizens of the United States and that their citizenship was wrongfully revoked. They pray for a mandatory injunction to restore their citizenship.

The single appellant in No. 9194 alleges that his naturalization as a citizen of the United States was scheduled for December, 1942, but was not granted due to false statements made by his divorced wife; that the administrative hearing granted him in the deportation proceedings did not comply with due process of law; and that the order of deportation is unconstitutional, illegal, contrary to existing law, and would work irreparable injury. In addition to injunction against deportation, this appellant asks declaratory judgment decreeing him to be a citizen of the United States. The allegations of the complaint in No. 9195 are similar to the allegations in No. 9193.

In his motions, and in the affidavits and exhibits in support thereof, appellee says that no order of removal has been issued against any of appellants except Riemschneider and Stade; that as to 54 appellants the administrative hearings have not yet been held; that 9 appellants have been released; that 4 appellants are alien enemies sent to this country from other American republics for restraint and repatriation, and these appellants are subject to the jurisdiction of the Secretary of State, and not of appellee, under Proclamation No. 2662 of the President, Sept. 8, 1945; and that Riemschneider and Stade have had hearings before an alien enemy hearing board and before a repatriation hearing board, and the Attorney General has formally declared them to be dangerous to the public peace and safety of the United States.

The revocation of naturalization is by civil action instituted by a United States District Attorney,[3] and the judgment of the trial court in such proceedings is subject to appeal. The usual rule that a judgment rendered in an action brought pursuant to statute and subject to appeal, cannot be attacked collaterally in a separate action for injunction, applies here. Therefore, the District Court had no jurisdiction in No. 9193 to order the restoration of citizenship where naturalization had been revoked in proceedings in a court of competent jurisdiction. Moreover, naturalization is a function conferred upon the courts, and not upon the Attorney General, and therefore the court could not require him to restore citizenship as prayed by appellants.

Proceedings for naturalization are prescribed by statute,[4] and the statute provides that "A person may be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this chapter, and not otherwise."[5] Therefore, the District Court had no jurisdiction

---

[1] Act of Aug. 24, 1937, c. 754, § 3, 50 Stat. 752, 28 U.S.C.A. § 380a.

[2] 1 Stat. 577, as amended 50 U.S.C.A. § 21 et seq.

[3] 54 Stat. 1158, 8 U.S.C.A. § 738.

[4] 54 Stat. 1140, 8 U.S.C.A. § 701.

[5] Id. at par. (d).

in No. 9194 to decree naturalization as prayed by the plaintiff therein.

■ Appellants did not allege that orders of deportation had been issued against them. Appellants in No. 9193 referred to a form letter dated July 17, 1945, promulgated by an Assistant Attorney General, saying that all interned alien enemies deemed by the Attorney General to be dangerous to the public peace and safety of the United States "shall be subject upon the order of the Attorney General to removal from the United States"; and appellants said that "therefore", unless the court granted injunction, they would be deported. Appellant in No. 9194 alleged "that he is in imminent danger of deportation". Appellants in No. 9195 said that they "are now threatened with deportation" and referred to a general notice issued by the Attorney General on July 17, 1945, notifying alien enemies who had had one hearing, that prior to the issuance of a final order they were entitled to another hearing, before a repatriation hearing board, and would be granted such a hearing upon request. In his motions and supporting affidavits, the Attorney General says that, except as to appellants Riemschneider and Stade, no removal orders have been issued. Thus, except as to these two appellants, the administrative procedure has not been completed and no facts are alleged to show such threat of deportation as to constitute ground for injunctive relief.[6]

The complaints contained no averment showing injury or threatened injury to the appellant League or its chairman.

■ The Alien Enemy Act is constitutional, both as an exercise of power conferred upon the Federal Government and as a grant of power by the Congress to the President. The first storm which broke upon the Constitution centered upon the powers of the new Federal Government over aliens. In 1798, the 5th Congress passed three acts in rapid succession, "An Act concerning Aliens", approved June 25, 1798,[7] "An Act respecting Alien Enemies", approved July 6, 1798,[8] and "An Act in addition to the act, entitled 'An act for the punishment of certain crimes against the United States'", approved July 14, 1798.[9] The first and last were the Alien and Sedition Acts, vigorously attacked in Congress and by the Virginia and Kentucky Resolutions as unconstitutional. But the members of Congress who vigorously fought the Alien Act saw no objection to the Alien Enemy Act.[10] In fact, Albert Gallatin, who led that opposition, was emphatic in distinguishing between the two bills and in affirming the constitutional power of Congress over alien enemies as part of the power to declare war.[11] James Madison was the author of the Virginia Resolutions, and in his report to the Virginia House of Delegates the ensuing year after the deluge of controversy, he carefully and with some tartness asserted a distinction between alien members of a hostile nation and alien members of a friendly nation, disavowed any relation of the Resolutions to alien enemies, and declared, "With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and of course to treat it and all its members as enemies."[12] Thomas Jefferson wrote the Kentucky Resolutions, and he was meticulous in identifying the Act under attack as the Alien Act "which assumes power over alien friends".[13] It is certain that in the white light which beat about the subject in 1798, if there had been the slightest question in the minds of the authors of the Constitution or their contemporaries concerning the constitutionality of the Alien Enemy Act, it would have appeared. None did.

---

[6] National War Labor Board v. Montgomery Ward & Co., 1944, 79 U.S.App. D.C. 200, 144 F.2d 528.

[7] 1 Stat. 570.

[8] 1 Stat. 577, 50 U.S.C.A. § 21 et seq.

[9] 1 Stat. 596.

[10] 8 Annals of Cong. 2035 (5th Cong., 1798).

[11] Id. at 1980.

[12] Madison's Report, 4 Elliot's Deb. 546, 554 (1800).

[13] Kentucky Resolutions of 1798 and 1799, 4 Elliot's Deb. 540, 541.

The courts, in an unbroken line of cases from Fries' case [14] in 1799 to Schwarzkopf's case [15] in 1943, have asserted or assumed the validity of the Act and based numerous decisions upon the assumption.[16] The judicial view has been without dissent.

At common law "alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war." [17]

■ If the power to remove alien enemies from its territory in time of war were not included in the powers granted the Federal Government by the Constitution, amendment to add that power would have to be made. Under no concept of government could a nation be held powerless to rid itself of enemies within its borders in time of war, whether the individuals concerned be actually hostile or merely potentially so because of their allegiance.

Unreviewable power in the President to restrain, and to provide for the removal of, alien enemies in time of war is the essence of the Act. The comment of the authorities we have mentioned has been directed to that feature. Chief Justice Marshall said, "The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself." [18] However jealously we may guard the civil rights of all residents within our borders, neither those considerations nor the "dictates of humanity and national hospitality" [19] can be permitted to impinge upon the overriding necessities of the power to wage war successfully.[20] The President not only has the power, under the broad grants by the Congress, but has the solemn responsibility to make certain that the conduct of war is not only unimpeded but suffers from no threat of impediment. "Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs." [21] As a practical matter, it is inconceivable that before an alien enemy could be removed from the territory of this country in time of war, the President should be compelled to spread upon the public record in a judicial proceeding the method by which the Government may detect enemy activity within our borders and the sources of the information upon which it * apprehends individual enemies. No constitutional principle is violated by the lodgment in the President of the power to remove alien enemies without resort or recourse to the courts.

The one question, whether the individual involved is or is not an alien enemy, is admitted by the Attorney General to be open to judicial determination. Except those who assert the wrongful revocation of their American citizenship, all appellants admit that they are German nationals and thus alien enemies, and so their cases do not involve that determination. For purposes of these actions, the other appellants are also alien enemies, because, as we have pointed out, the revocation of their naturalization is not open in these proceedings.

■ The constitutional question raised by appellants was not substantial, and the District Court was correct in denying the

---

14 Case of Fries, C.C.D.Pa.1799, 9 Fed. Cas. at pages 826, 830 et seq., No. 5,126.

15 United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 1943, 137 F.2d 898.

16 Brown v. United States, 1814, 8 Cranch 110, 3 L.Ed. 504; De Lacey v. United States, 9 Cir., 1918, 249 F. 625, L.R.A.1918E, 1011; Grahl v. United States, 7 Cir., 1919, 261 F. 487; Lockington's Case, 1813, 1814, Brightly, N. P., Pa., 269, 283; Lockington v. Smith, C.C.D.Pa., 1817, 15 Fed.Cas. page 758, No. 8,448; Ex parte Graber, D.C.N.D. Ala.1918, 247 F. 882; Minotto v. Bradley, D.C.N.D.Ill.1918, 252 F. 600; Ex parte Fronklin, D.C.Miss.1918, 253 F. 984; Ex parte Risse, D.C.S.N.Y.1919, 257 F. 102; Ex parte Gilroy, D.C.S.D.N.Y. 1919, 257 F. 110.

17 1 Blackstone * 372, 373.

18 Brown v. United States, supra, Note 16, 8 Cranch at page 123, 3 L.Ed. 504.

19 Alien Enemy Act, as passed in 1798, 1 Stat. 577.

20 Kiyoshi Hirabayashi v. United States, 1943, 320 U.S. 81, 93, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774.

21 Id.

application for designation of a three-judge court.[22]

■ The Alien Enemy Act has not been repealed. Appellants do not claim repeal in terms, but assert repeal by implication. They cite no statute effecting that result, and we have found none. As late as December 26, 1941, Congress in an act referred to the Alien Enemy Act by name as though it were in effect.[23]

■ Appellants say that the war has terminated and that, therefore, the Act, even if valid, is not in effect. No peace treaty has yet been signed with Germany, and the state of war has not been terminated by act of Congress or by Executive Proclamation. Cases involving the termination of other wars dispose of appellants' point.[24] It is not for the courts to determine the end of a war declared by the Congress.[25]

■ Presidential Proclamation No. 2655, promulgated July 14, 1945,[26] is within the precise terms of the statute. The Act authorizes the President "to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety." The Proclamation limits deportation to interned alien enemies "who shall be deemed by the Attorney General to be dangerous to the public peace and safety of the United States because they have adhered to the aforesaid enemy governments or to the principles of government thereof." The Proclamation is thus less, rather than greater, in scope than the Act.

■ The regulations of the Attorney General[27] are well within the authority given him by the Presidential Proclamation. They provide for a determination by the Attorney General as to whether the alien enemy is deemed to be dangerous to the public peace and safety of the United States, and for a thirty-day notification of the order directing that he depart from the United States, and for his release, unless the public safety otherwise requires, for thirty days in order that he may settle his personal and business affairs, provide for the recovery, disposal and removal of his goods and effects, and make arrangements to depart from the country. The Annual Reports of the Attorney General[28] indicate that out of about one million alien enemies in the country at the beginning of the war, only 2,525 were interned, on June 30, 1944, at the height of the conflict. Only those interned who were deemed by the Attorney General to be dangerous to the public peace and safety of the United States, are to be deported. These figures and the required hearings and finding indicate the restraint with which the Attorney General has exercised his authority.

■ The orders of the Attorney General in the cases of Riemschneider and Stade were fully authorized by the Presidential Proclamation. They show that Riemschneider was heard before an alien enemy hearing board on January 7, 1944, and before a repatriation hearing board on August 2, 1945, and that Stade was similarly heard on January 27, 1944, and August 9, 1945. Upon the basis of the evidence presented at those hearings, the Attorney General made a formal finding that these alien enemies are dangerous to the public peace and safety of the United States because they have adhered to a government with which the United States is at war or to the principles thereof. Thus, the findings show not only allegiance to an enemy government, which would have been sufficient basis under the Constitution and

[22] California Water Service v. Redding, 1938, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323; Jameson & Co. v. Morgenthau, 1939, 307 U.S. 171, 59 S.Ct. 804, 83 L. Ed. 1189.

[23] 55 Stat. 861, 18 U.S.C.A. § 198 note.

[24] The Protector, 1872, 12 Wall. 700, 20 L.Ed. 463; McElrath v. United States, 1880, 102 U.S. 426, 26 L.Ed. 189; Hijo v. United States, 1904, 194 U.S. 315, 24 S.Ct. 727, 48 L.Ed. 994; Kahn v. Anderson, 1921, 255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469.

[25] 55 Stat. 796, 50 U.S.C.A.Appendix note preceding section 1.

[26] 10 Fed.Reg. 8947.

[27] 10 Fed.Reg. 12189.

[28] Annual Report of the Attorney General (1942), p. 219; Id. (1943), p. 5; Id. (1944), p. 8.

the Act for the exercise of the power of removal, but also adherence to that government, which supplies the additional basis required by the Proclamation.

Appellants urge that the case is controlled by Schneiderman v. United States, Baumgartner v. United States, Hartzel v. United States, and Bridges v. Wixon, all supra. The Schneiderman and Baumgartner cases dealt with the cancellation of citizenship in a proceeding brought for that purpose. The Hartzel case dealt with a prosecution for violation of the Espionage Act of 1917, 50 U.S.C.A. §§ 31–42, 191–194. The Bridges case dealt with the deportation of an alien citizen of a friendly country, Australia. None of these dealt with the problems presented in the cases at bar.

The complaints in Nos. 9193 and 9195 fail to state a claim upon which relief could be granted. The complaint, the motion for summary judgment, and the affidavits and exhibits in support of the latter, in No. 9194, show that no genuine issue of material fact was involved and that as a matter of law defendant-appellee was entitled to judgment. The judgments of the District Court were correct.

Affirmed.