Ex parte ZENZO ARAKAWA et al.

ZENZO ARAKAWA et al. v. CLARK, Attorney General, et al.

No. Miscellaneous 1194.

District Court, E. D. Pennsylvania.

June 4, 1947.

Wayne M. Collins, George G. Olshausen, and Theodore Tamba, all of San Francisco, Cal., for petitioners.

James P. McCormick, Asst. U. S. Atty. and Gerald A. Gleeson, U. S. Atty., both of Philadelphia, Pa., for respondents.

GANEY, District Judge.

This is a petition for a writ of habeas corpus.

Pursuant to the authority conferred upon him by the Alien Enemy Act of 1798,[1] the President of the United States on December 7, 1941, issued Proclamation No. 2525,[2] which concerned Japanese alien enemies.

---

[1] R.S. §§ 4067–4070, 50 U.S.C.A. §§ 21–24.

[2] 6 F. R. 6321, 3 CFR, Cum. Supp., p. 273.

Following this proclamation, the relators were placed in various zones within the continental limits of the United States. On July 14, 1945, the President of the United States issued Proclamation No. 2655,[3] known as the Alien Enemy Removal Proclamation, which provided, in part, as follows:

"All alien enemies now or hereafter interned within the continental limits of the United States pursuant to the aforesaid proclamation of the President of the United States who shall be deemed by the Attorney General to be dangerous to the public peace and safety of the United States because they adhered to the aforesaid enemy governments or to the principles of government thereof shall be subject upon the order of the Attorney General to removal from the United States and may be required to depart therefrom in accordance with such regulations as he may prescribe."

Subsequent to the issuing of regulations[4] in conformity to the above proclamation, the Attorney General of the United States, upon considering the evidence presented to the Alien Enemy Hearing Board and the Repatriation Hearing Board, deemed the relators to be dangerous to the public peace and safety of the United States because they had adhered to the principles of a government with which the United States was at war, and ordered the relators to depart from the country within thirty days after being notified to do so. The order stated that the relators are Japanese alien enemies over the age of fourteen years who have heretofore been interned, and, at their request, given a full hearing. The order also provided that, in the event the relators failed or neglected to depart from the United States within the time allotted them, the Commissioner of Immigration and Naturalization was directed to provide for their removal to Japan. Upon their refusal to leave the United States within the thirty day period after receiving their notices to depart, the relators were apprehended and, pending their removal to Japan, sent to Seabrook Farms, Bridgeton, New Jersey, in which place they were interned at the time of the filing of this petition on January 27, 1947. Seabrook Farms are under the immediate supervision and control of Henry W. Beachwell, Chief Detention Officer, one of the respondents named in the petition. On the day the petition was filed, this court issued a rule to show cause why a writ of habeas corpus should not be issued upon the respondent, who filed a timely return thereto.

■ There can be no question that the Enemy Aliens Act is constitutional. "The Alien Enemy Act is constitutional, both as an exercise of power conferred upon the Federal Government and as a grant of power by the Congress to the President." Citizens Protective League v. Clark, 81 U.S.App.D.C. 116, 155 F.2d 290, 293. Also see United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 137 F.2d 898, and United States ex rel. Schlueter v. Watkins, D.C.S.D. N.Y., 67 F.Supp. 554, 556 and cases cited therein.

■ The relators claim that since there is no longer a declared war between the United States and Japan within the meaning of Section 21[5] of the Alien Enemy Act, the Act is inoperative and authority to do anything under it has lapsed. On the contrary, a state of war still exists between the United States and those nations which were formerly known as the Axis countries. The fact that the latter coun-

---

[3] 10 F. R. 8947, 3 CFR, 1945 Supp. p. 29.

[4] Regulations of the Attorney General, approved September 26, 1945, 10 F. R. 12189.

[5] "Whenever there is a declared war between the United States and any foreign nation or government, * * * and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized, in any such event, by his proclamation thereof, * * * to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; * * *." R. S. § 4067, 50 U.S.C.A. § 21.

tries have surrendered unconditionally, and that the President of the United States has officially proclaimed [6] that hostilities have ceased, has not officially terminated the war. No peace treaty between the United States and Japan has been signed and ratified by the Senate, nor has any joint resolution by Congress or executive proclamation been made terminating the war. United States v. Anderson, 9 Wall 56, 76 U.S. 56, 19 L.Ed. 615; Hijo v. United States, 194 U.S. 315, 323, 24 S.Ct. 727, 48 L.Ed. 994; Citizens Protective League v. Clark, supra; Citizens Protective League v. Byrnes, D.C., 64 F.Supp. 233; United States ex rel. Schlueter v. Watkins, supra. Until the war between the United States and Japan is officially proclaimed to be at an end, Japan is a hostile or enemy nation within the meaning of the Act.

In the alternative, the relators contend that if the war is not at an end and the Alien Enemy Act is in full force and effect, Section 21 of the Act governs removal only within the confines of the United States and that section 23 [7] of the Act governs removal out of the United States and requires judicial proceedings before a removal can be authorized. The wording of Section 21 of the Act places no such restriction on the word "removal." Under this section, an enemy alien may be removed to any place within the confines of the United States, or he may be expelled or deported to another country. The latter becomes more apparent when it is read in connection with Section 24 [8] of the Act. The Lockington's Case, 1813, Bright. N.P., Pa., 269, does not hold to the contrary.

This Court's interpretation of Chief Justice Tilghman's words [9] is that even if the alien enemy desires to leave this country, the public safety may require that he be kept in this country under proper restraint. The relators' interpretation of Section 23 of the Act is without merit when that section is also read in connection with Section 24 of the Act, which expressly recognizes that the removal prescribed under Section 21 and Section 23 are alternative methods. Ex parte Graber, D.C.N.D.Ala., 247 F. 882; Minotto v. Bradley, D.C.N.D.Ill., 252 F. 600; United States ex rel. Schlueter v. Watkins, supra, 67 F.Supp. at page 563.

As a basis for their third contention the relators argue that since there are no diplomatic relations between the United States and Japan, they can not be deported to the latter country. By this argument the relators seem to infer that the consent of the country to which they will be sent must be obtained before they may be removed to that country. The relators are in no position to raise this question. See Hudak v. Uhl, D.C.N.D.N.Y., 20 F.Supp. 928; and United States ex rel. Consola v. Karnuth, D.C.W.D.N.Y., 63 F.Supp. 727. Even if we assume that they could raise the question, the relators seem to lose sight of the fact that our military forces, under very able leadership, are in control of Japan, and that therefore the permission for their entry into that country will be presumed.

In continuing their argument along this line, the relators contend that they can not be deported against their will because

[6] Proclamation No. 2714, issued December 31, 1946, 12 F.R. 1, 3 CFR, —.

[7] "After any such proclamation has been made, the several courts of the United States, * * * are authorized and it shall be their duty, upon complaint against any alien enemy resident and at large within such jurisdiction or district, to the danger of the public peace or safety, and contrary to the tenor or intent of such proclamation, or other regulations which the President may have established, to cause such alien to be duly apprehended and conveyed before such court * * *; and after a full examination and hearing on such complaint, and sufficient cause appearing, to order such alien to be removed out of the territory of the United States, * * *." R.S. § 4069, 50 U.S.C.A. § 23.

[8] "When an alien enemy is required by the President, or by order of any court * * *, to depart and to be removed, it shall be the duty of the marshal * * * to provide therefore and to execute such order * * * by causing a removal of such alien out of the territory of the United States; * * *." R.S. § 4070, 50 U.S.C.A. § 24.

[9] In speaking of the Act, he said: "'It is a provision for the public safety, which may require that the alien should not be removed, but kept in the country under proper restraint.'"

the Treaty of Commerce and Navigation [10] entered into between the United States and Japan on February 21, 1911, and proclaimed' on April 5, 1911, has impliedly amended the Alien Enemy Act with respect to them. Treaties vary widely in character and subject matter, and what effect war has on them depends in a large measure on their character and subject matter. Some are uneffected by war, some are merely suspended, while others are totally abrogated. Karmuth v. United States, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677. It would seem that treaties of commerce and navigation would fall into the second or last of the above categories, because the carrying out of their terms would be incompatible with the existence of a state of war. See The Sophie Rickmers, D.C., 45 F.2d 413. It is apparent from a provision [11] in the treaty that it was the intention of the United States and the other party that the treaty was not to be perpetual, but was to continue only at the will of either of them. As a consequence no rights become vested as a result of the treaty. Whether the treaty had been terminated prior to the outbreak of war between the United States and Japan is not clear.[12] However it is apparent that if the treaty had not been previously terminated, it was totally abrogated, or at least suspended, when Japan struck at Pearl Harbor. Therefore the relators can claim no rights under that treaty.

■■ Finally the relators contend that their detention and threatened removal by the respondent are in violation of their constitutional rights. An alien enemy, in time of war, has only those rights which are not taken away from him by the President of the United States acting within the authority conferred upon him by law. Therefore, when a relator, hostile or other-

wise, has been detained and ordered removed from this country pursuant to executive orders, this court is without power to review the orders or the means by or the manner in which, he was detained and ordered removed except with respect to the question whether the relator is other than an alien enemy. United States ex rel. Schwarzkopf v. Uhl, supra, 137 F.2d at page 900; United States ex rel. Schleuter v. Watkins, supra, 67 F.Supp. at page 565.

■ In their petition, the relators state: "That no petitioner is * * * now and never has been a hostile alien enemy or an alien enemy within the meaning and purview of the provisions of the Alien Enemy Act, Title 50 U.S.C.A., Secs. 21–24 or otherwise, * * * no petitioner is a native, citizen, denizen or subject of any hostile nation or government within the meaning and purview of said Alien Enemy Act, no petitioner is an alien enemy within the meaning and purview of Presidential Proclamation No. 2655 (7 F.R. 8947) promulgated July 14, 1945; * * *." While on the other hand, the orders of the Attorney General of the United States, as has been previously mentioned, and the respondents' return state that the relators are natives of Japan. In spite of these apparent conflicting statements of facts, both sides concede that there are no factual issues to be passed upon, but only issues of law are to be determined by the court. The relators are not ready and able to proffer evidence to show that they are not natives of Japan. This could not be ascertained by the court upon a reading of the petition alone. It develops that the relators sole means of attack is that they are not alien enemies within the meaning of the Act as interpreted in accordance with the contentions advanced by them. This court has already decided against these contentions. There-

[10] 37 Stat. 1504. Article I of the Treaty provided that citizens and subjects of the contracting parties within the other's country "Shall receive * * * the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or may be granted to native citizens or subjects * * *".

[11] The first paragraph of Article XVII provided: "The present Treaty shall en-

ter into operation on the 17th of July, 1911, and shall remain in force twelve years or until the expiration of six months from the date in which either of the Contracting Parties shall have given notice to the other of its intention to terminate the Treaty."

[12] See Hackworth, Digest of International Law (U. S. Gov. Print. Office, 1943).

fore, since no issues of fact are involved, the bringing of the relators into court will be unnecessary. See Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 85 L.Ed. 830; Dorsey v. Gill, 80 U.S.App.D.C. 9, 148 F.2d 857, 866, certiorari denied, 325 U.S. 890, 65 S.Ct. 1580, 89 L.Ed. 2003.

The petition is denied.