## UNITED STATES v. KLAPPROTT.
### Civ. No. 2190.

United States District Court
D. New Jersey.
June 23, 1949.

Alfred E. Modarelli and Edward V. Ryan, Newark, New Jersey, for plaintiff.

Frederic M. P. Pearse, Newark, New Jersey, Morton Singer, New York City, P. Bateman Ennis, Washington, D. C., for defendant.

LEDERLE, District Judge (sitting by Special Designation).

## Findings of Fact

1. This action was instituted May 12, 1942, seeking revocation of the citizenship certificate issued to defendant, August Klapprott, on November 16, 1933, claiming that he had taken a false oath of allegiance to procure the certificate. Defendant was served with copy of the complaint and summons on May 15, 1942. He has never filed an answer, either personally or by counsel. The records of the Clerk of this court show that on July 17, 1942, the testimony of F.B.I. Agents William Rulon Paxman and H. Bruce Baumeister was heard by the court and default judgment ordered entered, cancelling defendant's certificate of naturalization, without findings of fact and conclusions of law. On January 7, 1947, defendant, through counsel, filed a petition, supported by defendant's affidavit, asking that the default judgment be vacated and defendant given an opportunity to enter a defense to the cause on the merits. This petition was overruled by order entered February 17, 1947, based upon an opinion of District Judge William F. Smith, filed February 7, 1947, D.C., 6 F.R.D. 450. The Third Circuit Court of Appeals affirmed in Klapprott v. United States, 166 F.2d 273. This decision was ultimately reversed by the Supreme Court in an opinion dated January 17, 1949. See: Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384. Upon motion of the Government, an amended mandate was entered April 4, 1949, by the Supreme Court, ordering: "The judgment of the Court of Appeals is reversed and the cause is remanded to the District Court with directions to receive evidence on the truth or falsity of the allegations contained in petitioner's petition to vacate the default judgment entered in the denaturalization proceedings." In pursuance of this amended mandate, pre-trial hearings were held on June 13 and June 14, 1949, resulting in a stipulation of some of the facts, incorporated herein as findings 2 to 24, inclusive. Each party also submitted proposed findings of fact and conclusions of law. Trial was held June 15 and June 16, 1949, at which the court heard the testimony of some 22 witnesses.

2. Defendant was born at Brochthausen, Germany, on September 4, 1906.

3. Defendant arrived in the United States of America on September 19, 1927.

4. Defendant filed a declaration of intention to become a citizen on January 30, 1928 in the Bergen County Common Pleas Court and filed his petition for naturlization on July 27, 1933 in said Court; defendant was naturalized on November 16, 1933 and received Certificate of Naturalization No. 3707549 in Bergen County Common Pleas Court, Hackensack, New Jersey.

5. Defendant entered Christ Hospital, Jersey City, New Jersey on March 8, 1942 and was discharged therefrom on March 26, 1942.

6. Defendant was served personally with a summons and complaint in the above action for denaturalization at Camp Nordland, Andover, New Jersey, on May 15, 1942.

7. Defendant had 60 days in which to appear and answer after service of the summons and complaint herein. Defendant's time to answer expired on July 14, 1942.

8. Indictments against the defendant and others were filed in the United States District Court for the Southern District of New York on July 7, 1942, charging defendant, along with others, with (1) violation of the Selective Training & Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq.; and (2) violation of the Alien Registration Act of 1940, 8 U.S.C.A. §§ 137, 155, 156a, 451 et seq.

9. On July 7, 1942, a warrant for removal of defendant to the United States District Court for the Southern District of New York was issued and the defendant surrendered and was taken into custody by Special Agents of the F.B.I. on the removal warrant at Camp Nordland, Andover, New Jersey. Defendant was questioned for four hours, and was taken before United States Commissioner Holland at the Federal Building, Newark, New Jersey, where he was arraigned, and waived hearing on removal. Bail was fixed at $10,000, on default of which he was retained in custody and delivered by the United States Marshal for the District of New Jersey to the Hudson County Jail, Jersey City, New Jersey. He was detained there for two days until July 9, 1942, at which time, Deputy Marshals for the District of New Jersey, in execution of the removal warrant, transported and delivered defendant to the United States Marshal for the Southern District of New York, at New York City.

10. On July 9, 1942, at the United States District Court for the Southern District of New York, the defendant entered pleas of "not guilty" to the indictments filed against him in that district and his bail was fixed at $25,000, in default of which he was delivered to the custody of the United States officials at the Federal House of Detention, New York City.

11. Defendant was represented in the criminal proceedings in the Southern District of New York by court-appointed counsel, to wit: Edward W. McDonald.

12. That from July 9, 1942 to and including the date of entry of the default judgment herein, the defendant was confined at the Federal House of Detention in New York City.

13. The default judgment was entered in this action on July 17, 1942 and thereafter the order was amended in formal particulars on November 2, 1942.

14. The trial of the criminal charges against the defendant in the Southern District of New York began September 17, 1942 and on October 19, 1942, the jury brought in a verdict of "guilty". Klapprott was sentenced to 5 years on October 21, 1942 on the charge of violating the Selective Service Act. Neither the defendant, nor any other of his co-defendants in the criminal proceedings referred to testified or presented proof in his or their behalf.

15. Klapprott was in daily attendance at his trial in New York and was represented by said court-appointed counsel, Edward W. McDonald, Esquire.

16. On October 23, 1942, a notice of appeal was filed in said criminal action

284

to the United States Court of Appeals for the Second Circuit, which Court affirmed the conviction of the defendant on February 29, 1944, United States v. Keegan, 141 F.2d 248. On the appeal, defendant was represented by John F. X. Finn, Esquire, who was appointed by the court to handle the appeal.

17. On June 11, 1945, the Supreme Court of the United States reversed the affirmance by the Circuit Court of Appeals for the Second Circuit, referred to above, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745.

18. From October 21, 1942 to on or about June 12, 1943, defendant was detained at the House of Detention, New York City; that on or about the 28th day of May, 1943, defendant signed an election to enter upon service of his sentence and it was filed with the United States District Court for the Southern District of New York on June 1, 1943.

19. The defendant entered upon the service of his sentence imposed by the United States District Court for the Southern District of New York at Milan, Michigan on or about June 12, 1943 and remained there until on or about January 24, 1944, at which time he was transferred to the Washington Asylum & Jail, Washington, D. C. on Writ of Habeas Corpus to defend a criminal indictment returned against him and others in a case known as the Sedition Case, (United States v. McWilliams, et als), D.C., 54 F.Supp. 791.

20. Thereafter, the defendant was in custody at the Washington Asylum & Jail, Washington, D. C. from January 24, 1944 to and including December 6, 1946 when he was transferred to Ellis Island, New York.

21. Counsel was assigned to defend defendant and did defend him in the "Sedition Case"; the trial ended on November 29, 1944, at which time a mis-trial was declared due to the death of the presiding judge. The trial was not resumed and on motion filed by the defendants, the case was dismissed by the court on November 22, 1946 and the order of dismissal was entered December 2, 1946.

22. Defendant was one of a group of 159 aliens who filed an action to enjoin the Attorney General from deporting them. Citizens Protective League v. Clark, 81 U.S.App.D.C. 116, 155 F.2d 290, certiorari denied December 9, 1946, 329 U.S. 787, 67 S.Ct. 354, 91 L.Ed. 674. This action was instituted on behalf of defendant while he was confined at the Washington Asylum & Jail.

23. On January 11, 1945, a Writ of Habeas Corpus was issued out of the District Court, District of Columbia at defendant's request through an attorney, also during his confinement at Washington, D. C.

24. The petition in the proceeding at bar was signed by the defendant on December 12, 1946, was filed with the United States District Court for the District of New Jersey on January 6, 1947, and an order to show cause was issued. A hearing was held on January 28, 1947. The District Court denied the application on jurisdictional grounds and the case was taken on appeal to the United States Circuit Court for the Third Circuit which affirmed the District Court. Thereafter, the case was taken to the United States Supreme Court and the judgment below was reversed on January 17, 1949, 335 U.S. 601, 69 S.Ct. 384.

25. Findings 26 to 32, inclusive, are based on a specific consideration of various allegations of defendant's petition to vacate.

26. During the Spring of 1942, defendant was seriously ill, suffering from stomach ulcers, and was confined to Christ Hospital, Jersey City, from March 8 to March 26, 1942, which illness endangered his life and required two blood transfusions. Upon his release from the hospital, petitioner was in very poor health, as a result of which he was advised to live in a place where he could receive proper rest and relaxation. Since petitioner was in very poor financial circumstances and in view of his affiliations with the German-American Bund, which was at that time the owner of a recreation camp at Andover, New Jersey, known as Camp Nordland, petitioner made arrangements to live at Camp Nordland until such time as his health improved.

27. While living at Camp Nordland and on the 15th of May, 1942, petitioner was served with summons and complaint in the above-mentioned proceedings. The allegations of paragraph 4 of the petition that, "In view of his poor physical condition, petitioner was unable to get around very well and since he was also in very poor financial condition petitioner had no money with which to retain a lawyer to represent him," are false. Plaintiff's health was steadily improving. He had been employed in New York for a considerable length of time before his illness. He is more than ordinarily intelligent. He was an editorial writer on a newspaper. He was a leader and lecturer in various organizations. He owned a station wagon, which he drove 40 miles to New York City on June 9, 1942, stayed overnight in New York, took the train the following day to Hartford, Connecticut, where he testified before a Grand Jury in response to a United States subpoena served on him. The United States Marshal advanced him $10.00 to pay the expense of this trip. He returned to New York, spending another night there, and then drove his station wagon back to Camp Nordland the next day. Prior to July 7, 1942, he sold the station wagon for $200.00.

28. The petition alleges in paragraph 4, "In order to obtain some legal assistance, petitioner wrote out and addressed a letter to the American Civil Liberties Union of New York, in which he explained that he had no money with which to retain a lawyer and requested that they arrange for some legal assistance for him. This letter was in petitioner's possession on the day of his arrest and was taken away from him by the Federal Bureau of Investigation, and so far as petitioner knows, it was never mailed and is undoubtedly in the hands of the United States Department of Justice. Petitioner had also drawn up a draft of an answer to the complaint and was working on it at the time of his arrest, but because of the fact that he was taken into custody, petitioner was unable to complete it and it was left at petitioner's home when he was taken away." These allegations, upon conflicting testimony and considering all the surrounding circumstances, I find to be false. At the time defendant surrendered to the two F. B. I. Agents on July 7, 1942, at Camp Nordland, for removal to the New York District Court, defendant voluntarily signed a document authorizing these agents to search his premises and take therefrom any letters or papers they desired. Such a search was made in the presence of defendant, and three letters were seized, namely, envelopes addressed to defendant postmarked, respectively, Chicago, January 28, 1942; Milwaukee, January 28, 1942; and Milwaukee, January 15, 1942. Each of these envelopes contained a letter written in the German language. No other letters, papers, or documents were seized. For many years after judgment herein, defendant made no mention of any letter to the American Civil Liberties Union or partial answer to the complaint, and these F. B. I. Agents neither saw nor seized any such documents at the time of this search and seizure on July 7, 1942. The defendant's story of the existence of these documents and their disposition is not worthy of belief.

29. Defendant was arraigned in the United States District Court for the Southern District of New York on July 9, 1942, in the so-called "Selective Service Case," at which time he pleaded not guilty. Edward W. McDonald, a New York Attorney, was appointed by the court on July 28, 1942, to defend this defendant and three others in that case. This attorney had neither known nor spoken to defendant prior to such appointment. He represented defendant throughout the four or five weeks trial, consulted with him for the month between appointment and trial at the Federal House of Detention where defendant was kept, consulted with him at the trial, during recesses, and, outside of court hours, at the Federal House of Detention. Mr. McDonald has since become an Assistant United States Attorney in New York, and, more latterly, a United States Commissioner there. He has never been admitted to practice in any New Jersey Court. Some time after July 28, 1942, during the course of a consultation Mr. McDonald had relative to that case with defendant Klapprott and another defendant whom he was as-

signed to represent, defendant Klapprott mentioned his denaturalization case and stated that his time to answer had expired. Mr. McDonald told the defendant, in effect, that he could not undertake any responsibility in connection with the denaturalization case. 3 Cir., 166 F.2d 273. At the time of Mr. McDonald's first contact with defendant, the default judgment of denaturalization had been ordered eleven days previously in New Jersey. Accordingly, I find as false petitioner's allegation in paragraph 5 of his petition that, "This attorney promised to look into the matter, but petitioner later found out that instead of doing so, he neglected the matter entirely and permitted the judgment to be entered against petitioner by default, after having, by his promises, lulled petitioner into a sense of security with respect to this matter."

30. Defendant concedes that by the time he was taken to the Tombs Prison on September 10, 1942, for a week before the New York trial commenced, he knew that his citizenship certificate had been cancelled.

31. I find as false the conclusion in paragraph 6 of the petition, that up to the end of the Selective Service trial in New York petitioner "was still unable to take any steps in connection with the denaturalization proceedings."

32. On several different occasions between the time of service of the summons and complaint herein on May 15, 1942, and the time of defendant's arraignment on the New York removal warrant on July 7, 1942, defendant stated that he did not intend to defend the denaturalization case. Of particular significance was one of such occasions, June 27, 1942, when the two F. B. I. Agents visited defendant at Camp Nordland for the express purpose of ascertaining whether or not he intended to contest the denaturalization case and also of discussing with him the matter of his loyalty or disloyalty to the United States. One of these agents, Baumeister, testified at the time of hearing for entry of default judgment herein. Taking into consideration all of the circumstances as shown by the evidence adduced at this present hearing, I find defendant's allegation, in paragraph 9 of his petition, that he did not intend to

permit this matter to go by default, is false. His intention to contest this denaturalization case was first formulated years after the judgment was entered.

33. For purposes of this record it was conceded that, if questioned on the subject, defendant would testify contrary to the allegations of the complaint relative to his having fraudulently and illegally obtained his citizenship certificate and that the Government is prepared to offer proof supporting such allegations of the complaint.

34. The physical condition of the defendant between May 15, 1942 and the date upon which default judgment was entered against him, to wit: July 17, 1942, did not prevent him from entering a defense to the action and was not of a nature or degree such as would excuse him from so defending.

35. Between May 15, 1942, the date upon which the defendant was served with process herein, and July 7, 1942, he did not answer or appear in the above action and made no effort to obtain counsel to appear or act for him in his behalf.

36. Between July 7, 1942 and the date default judgment was entered on July 17, 1942, the defendant was not prevented by any person or officer of the Federal Government from applying to any court, attorney, or other person for assistance in defending himself in this action.

37. Throughout the confinement of the defendant, from July 7, 1942 until and including the date upon which his petition for relief was filed herein, during which time defendant was confined at the Federal House of Detention, New York City; the Federal Correctional Institution, Milan, Michigan; the Washington Asylum & Jail, Washington, D. C., and Ellis Island, New York, the defendant was at all times permitted to communicate with persons and attorneys and to receive visitors, including the attorneys for any legitimate purpose, concerning the defense or protection or the institution of actions to protect his legal rights.

38. During such period of time, the defendant conferred with several different attorneys in New York City and at Wash-

ington, D. C. in connection with the cases in which they represented him, respectively, including the criminal case against him in the Southern District of New York; the appeal from his conviction in that action; the "Sedition Case" in the District of Columbia; the Citizens' Protective League case in the District of Columbia, which was an action to enjoin the Attorney General from deporting the defendant and a large number of other aliens, and a habeas corpus proceeding instituted by an attorney on behalf of the defendant in the District of Columbia. In the course of all such proceedings, the defendant conferred with the attorneys who represented him in the various actions mentioned above and on the appeals in such actions, freely and without restriction.

39. The defendant did not at any time up to the filing of the petition which is now under consideration, take any steps or obtain the assistance of any attorney in this action.

40. During the periods when the defendant was confined in the Federal House of Detention, New York City; the Federal Correctional Institution, Milan, Michigan; the Washington Asylum and Jail, Washington, D. C., and Ellis Island, New York, the defendant, who was a bricklayer and mason by trade, performed the functions of such trade at the institutions in which he was confined in the course of which he performed manual labor.

41. Defendant was not prevented from taking steps to apply for relief from the default judgment filed herein by any of the officers or agents of the United States at any of the institutions where he was confined and he was not so prevented by any rule or restriction applicable at any of such institutions.

42. The defendant took an active part and attended a criminal trial against him in the Southern District of New York for a period of several weeks; participated in the presentation and filing of his appeal from his criminal conviction in the Southern District of New York; while confined at Washington, D. C. with the "Sedition Case", attended court on many days during the years 1944, 1945, and 1946; and in the habeas corpus action brought in the District of Columbia, without being in any way restricted by any agent or officer of the United States in connection with such actions, except insofar as it was necessary for him to be confined at the institutions where he was then held following the conclusion of the court proceedings each day.

43. During defendant's one week confinement in Tombs Prison, New York City, before trial of the New York Selective Service case, he was informed by other inmates that the cell he occupied had just been vacated by a person who had just been removed to the "death house" at Sing Sing Prison, Ossining, New York, and that such cell was always used for detaining persons charged with murder.

44. During the period of the Selective Service trial in New York, the authorities at the Federal House of Detention, New York City, kept defendant and the other "Selective Service Case" prisoners segregated for a time because of friction between them and other inmates, and the authorities censored all newspapers and deleted therefrom articles concerning such trial.

45. Defendant gave prison authorities a history of his stomach disorder at the time he was delivered to the Federal House of Detention, New York, and a bland diet was prescribed for defendant, which was continued for a short period of time.

46. After the conviction in the Selective Service case, defendant's court-appointed counsel, McDonald, came to see defendant and informed defendant that he was through with the case. Thereafter, John F. X. Finn was appointed counsel, and handled the appeals mentioned in findings 15 and 16.

47. Upon defendant signifying his election to enter upon service of the sentence in the Selective Service case, he was removed from the Federal House of Detention, New York, to the Federal Correctional Institution, Milan, Michigan, by automobile, handcuffed to another prisoner. Upon arrival at Milan, defendant was

placed in a cell which other inmates informed him had been occupied for a time by a prisoner who had been under death sentence for treason. During defendant's confinement at Milan, he and other so-called "political prisoners" were segregated in a separate cell block on the third floor, which prison officials described as the most desirable location to be confined, particularly because this cell block is the least guarded and has its own recreational facilities on the roof of the prison.

48. During defendant's removal from Milan to Washington, D. C., on January 24, 1944, to answer the charges in the "Sedition Case", the trip was by bus and train, and defendant was kept in leg irons. During defendant's confinement in the Washington Asylum & Jail, Washington, D. C., he was segregated with other "Sedition Case" defendants.

49. The various institutions in which defendant was confined compare favorably with other like institutions in which prisoners are customarily confined in this country. His mail and other reading matter was censored by the Department of Justice, in the same manner as mail of other inmates. This procedure required 5 to 15 days longer for the receipt and delivery of defendant's mail than is required for ordinary mail deliveries outside an institution.

50. The "Sedition Case" at Washington, D. C., consumed approximately eight months, during which period of time defendant was represented by court-appointed counsel.

51. Outside of court hours, during the period from January 24, 1944 until December 2, 1946, the defendant was confined in the Washington Asylum & Jail for the District of Columbia.

52. During the course of the "Sedition Trial", defendant rode back and forth from the jail to the court in an enclosed van. Over 1100 exhibits had been offered by the Government in evidence up to the time of the mistrial, at which time the Government was still presenting its case. There were over 18,000 pages of testimony up to the time of mistrial.

53. A great many of the exhibits were in German, and were translated on the witness stand by Government translators and, as a result, the defendant and others with a knowledge of German occupied themselves with the checking of translations.

54. On December 6, 1946, defendant was removed from the Washington Asylum & Jail for the District of Columbia to Ellis Island, New York, at which time all criminal charges of any nature against the defendant had been reversed or dismissed. Defendant was removed to Ellis Island for the purpose of deportation, as a result of the decree of denaturalization heretofore obtained in the United States District Court for the District of New Jersey.

55. The defendant, Klapprott, knowingly, voluntarily, and intentionally failed to defend the above-entitled action at all times up to the date of the default judgment, and for many years thereafter.

### Conclusions of Law

1. Where, as here, it appears that the essential allegations of a petition filed four and one-half years after entry of a default judgment of denaturalization, seeking to have such judgment vacated, such allegations being, briefly, that the defendant had intended to defend the action and had taken some steps to accomplish this purpose but was prevented from doing so by actions of Government agents, by illness and lack of funds, are false, and that defendant knowingly, voluntarily, and intentionally permitted the entry of default judgment, the defendant has not shown good cause or reason to have the default judgment vacated under any provisions of Rule 60 (b), as amended, Federal Rules of Civil Procedure, 28 U.S.C.A., or under the ruling of Klapprott v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745.

2. Accordingly, order overruling the petition to vacate default judgment herein is being entered simultaneously herewith.

### Order Overruling Petition to Vacate Default Judgment

In accordance with the foregoing findings of fact and conclusions of law,

It Is Hereby Ordered that the petition filed herein by defendant on January 6, 1947, seeking to have the default judgment herein vacated, is hereby overruled.